## State of Connecticut *v.* Eric K. Steiger
## (13766)

Peters, C. J., Callahan, Glass, Covello and Hull, Js.

Argued January 17—decision released April 16, 1991

*F. Mac Buckley,* with whom was *Hope C. Seeley,* for the appellant (defendant).

*Rita M. Shair,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, *John H. Malone* and *Rosita Creamer,* assistant state's attorneys, and *Kathryn St. Amand,* law student intern, for the appellee (state).

CALLAHAN, J. The defendant, Eric K. Steiger, was charged in an amended information with two counts of murder in violation of General Statutes § 53a-54a, one count of capital felony in violation of General Statutes § 53a-54b (8), one count of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a, and one count of conspiracy to commit capital felony in violation of §§ 53a-48 and 53a-54b (8).[1] Dur-

---

[1] "[General Statutes] Sec. 53a-54a. MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under

ing the course of his trial before a three judge panel, the defendant introduced evidence in support of his affirmative defenses of lack of capacity due to mental disease or defect; see General Statutes § 53a-13;[2] and extreme emotional disturbance. See General Statutes § 53a-54a (a). The defendant also asserted that he did not have the specific intent to cause the deaths of the victims because he suffered from a mental disease or defect that rendered him incapable of forming that intent. See General Statutes § 53a-54a (b). The three judge panel convicted the defendant on all counts. In the penalty phase of the proceedings, the panel unanimously made a special finding of aggravating factors and a majority of the panel issued a special finding of

subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

"[General Statutes] Sec. 53a-54b. CAPITAL FELONY. A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

"[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] "[General Statutes] Sec. 53a-13. LACK OF CAPACITY DUE TO MENTAL DISEASE OR DEFECT AS AFFIRMATIVE DEFENSE. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

"(b) It shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a licensed practitioner, as defined in section 20-184a, and was used in accordance with the directions of such prescription.

"(c) As used in this section, the terms mental disease or defect do not include (1) an abnormality manifested only by repeated criminal or otherwise antisocial conduct or (2) pathological or compulsive gambling."

mitigating factors. The defendant received a sentence of imprisonment for the remainder of his life without the possibility of release for the capital felony conviction and an identical sentence for conspiracy to commit capital felony, with the latter sentence running concurrently to the former. No sentences were imposed for the other three convictions. The defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3).[3]

On appeal, the defendant claims that his constitutional privilege against self-incrimination and his right to due process of law were violated when the trial court admitted into evidence a videotape recording of a psychiatric examination of the defendant conducted pursuant to Practice Book § 760.[4] The defendant also appears to claim that his sixth amendment right to counsel was implicated by the admission of the videotapes. Finally, the defendant contends that the trial court improperly concluded that he failed to prove his affirmative defenses by a preponderance of the evidence and that the state proved beyond a reasonable doubt that he intended to cause the deaths of the victims. We affirm the judgment of the trial court.

The three judge panel could reasonably have found the following facts. At approximately 9 p.m. on July 11,

---

[3] General Statutes § 51-199 (b) (3) provides in pertinent part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony . . . ."

[4] "[Practice Book] Sec. 760. —— ——PSYCHIATRIC EXAMINATION

"In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination provided for by Sec. 757, whether the examination shall be with or without the consent of the defendant, shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. A copy of the report of the psychiatric examination shall be furnished to the defendant within a reasonable time after the examination."

1987, the defendant and his longtime friend, Andrew Patterson, drove to meet a group of young people who were talking and drinking beer while gathered at a cul-de-sac at the end of Kingfisher Lane in a new housing development in Suffield. There they met Patterson's brother, Bryan Patterson, and his friend, Richard Bazzano. At approximately 10 p.m., a pickup truck pulled up to the group and two men, Daniel Seymour and William Price, exited from the truck with metal pipes in their hands. They informed the group that there were now families living in the area and told them that they would have to leave.[5] As people began to disperse, the defendant approached the two men and asked why the group was being harassed. At that time, one of the men told the defendant that he could take his head off with one swing of the pipe he was carrying. During the altercation that followed, the defendant was poked on the nose with a pipe, after which he mumbled, "I'm coming back."

After returning to his car, the defendant became very agitated. He began banging his head against the steering wheel and shouting that he was going to go back and kill the two men. At this point, Bryan Patterson, who had left the gathering before the arrival of Price and Seymour, returned to the cul-de-sac and learned of the confrontation. When the defendant drove away from the area with Andrew Patterson and Bazzano, Bryan Patterson and several others followed the defendant to his mother's home in Suffield where the defendant was living. During the ride, Andrew Patterson told the defendant that this was "the offensive"[6]

---

[5] The Seymour family had moved into a home on Kingfisher Lane on July 10, 1987.

[6] The "offensive" was an elaborate plan that the defendant and Andrew Patterson had been discussing since approximately 1980 when they were both in high school. Peter Zeman, a forensic psychiatrist who testified for the defendant, described the offensive in his psychiatric evaluation report

and that the defendant had to take the initiative. When Bazzano asked what "the offensive" was, the defendant said, "it's to kill people." Upon arriving at his home, the defendant told the girls in the group to leave and told the others that he was "going back with a gun" and that "those guys are history."

After the others left, the Patterson brothers and Bazzano followed the defendant to the garage attic where he kept his weapons. There the defendant put on a camouflage outfit, a black ski mask, and an Irish Republican Army pin. He then instructed Bazzano and Andrew Patterson to begin loading ammunition into certain weapons, including an M-1 carbine and a Browning nine millimeter pistol. The defendant also told Bryan Patterson to keep his mother occupied so that she would not call the police. Meanwhile, the defendant, Andrew Patterson and Bazzano loaded approximately 700 rounds of ammunition into various weapons and magazines. The defendant told Andrew Patterson that the plan was to drop him off at Kingfisher Lane and he would meet the others later at a local school. The defendant also gave a .44 magnum handgun to Andrew Patterson as if it were a final gift and said that he had wanted to kill himself the prior week anyhow.

After spending approximately forty minutes loading the weapons, the group left the attic. When they did, the defendant was armed with the M-1 carbine, the nine millimeter pistol, both of which were loaded, and a ten inch knife. He also wore a combat harness loaded with

---

as "a concept developed between Mr. Steiger and Mr. Patterson which is a central component of their relationship and which has been an obsession and driving force in the defendant's life over the past seven years. It grew from their feelings of being 'pushed around' and taken advantage of by their peer group. Its form was an elaborate and complex military fantasy which they both spent endless hours thinking about, discussing, and on occasion acting upon. Central to the offensive was the requirement that they both would kill their enemies including the police and then commit suicide."

full magazines of ammunition. As the four men gathered outside the house, one of them offered the defendant the use of a police scanner, which he accepted. The defendant also ingested some diet pills at that time. In accordance with the defendant's instructions, Bryan Patterson and Bazzano then lifted the defendant into the hatchback area of the defendant's automobile and lowered the hatch without locking it. Andrew Patterson drove the defendant's car while Bazzano rode in the passenger seat and Bryan Patterson followed in his own car. At one point, the defendant told Andrew Patterson to slow down because he did not want to get pulled over for speeding.

Upon arriving at Kingfisher Lane at approximately 11 p.m., the defendant directed Bryan Patterson to pull his vehicle into the driveway of the Seymour home to see if the pickup truck was there. After Bryan Patterson did so, Seymour and Price came out of the house and began hitting Bryan's car with metal pipes. As Bryan drove away from the Seymour home, Andrew Patterson shouted, "Go, Eric, go." At that point, the defendant rolled out of the back of the hatchback in military fashion. Bazzano and Andrew Patterson then drove away. As Seymour and Price advanced toward the defendant, Seymour said, "You think you're a tough guy with a gun," and the defendant responded, "Yes." The defendant fired a warning shot into the air but Seymour and Price kept coming toward him carrying the metal pipes. The defendant then shot one of the victims, who fell, and he then turned and shot the other. After the second victim fell, the defendant reloaded the nine millimeter pistol and fired a number of shots into Price while he lay on the ground.

Kathleen Seymour, the mother of one of the victims, and Diane Seymour, Price's fiancee, were watching from the front porch area. As they screamed, the

defendant yelled back, "You get your fuckin' ass out here and I'll do the same thing to you." The defendant then ran off into the woods. The two victims, Seymour and Price, were pronounced dead at the scene at 11:32 p.m., both having suffered multiple gunshot wounds to the chest and abdomen.

After leaving the scene, the defendant ran through woods and fields and reached his home at approximately 12:45 a.m. on July 12, 1987. Upon arriving home, he told his mother that terrorists had been after him with pipes and that he had shot them. His mother described him as "wild looking" and "shaking" at this point. After his mother suggested calling his father or the police, the defendant told her that he would shoot his father if he came. Thereafter, the defendant and his mother walked to a nearby golf course and sat down. While there, he told her that he was on a mission and had to kill himself because that was part of "the offensive." His mother told him that he was sick and that he should go to her sister's house in the Bronx. The defendant instead said that he had to talk to Andrew Patterson and departed on foot.

He was unable to talk to Andrew Patterson, however, because Andrew and Bazzano had left Connecticut for Vermont shortly after the shooting. The defendant, nonetheless, did go to the Patterson home and when Bryan Patterson arrived there at approximately 2:15 a.m. on July 12, 1987, the defendant came from behind the Pattersons' garage. The defendant told Bryan that he had killed the two men and asked what he should do. Bryan suggested to the defendant that he should turn himself in to the police. The defendant rejected Bryan's advice. Then, after giving Bryan his web ammunition belt and telling him to throw it into the Connecticut River, the defendant hugged Bryan and returned to his home.

Subsequently, as his mother had advised, the defendant drove to his aunt's apartment in the Bronx, where he arrived at approximately 11 a.m. on July 12, 1987. The defendant called his father from his aunt's apartment and threatened to kill himself, but his father persuaded him to return to Connecticut and surrender to the police. He returned and was arrested that same afternoon. Subsequently he gave a voluntary statement to the police describing the events related to the shooting.[7]

I

On December 9, 1987, the defendant filed a notice of defense of mental disease or defect pursuant to Practice Book §§ 758 and 759.[8] On January 22, 1988, the

[7] Bazzano later entered into an immunity agreement with the state. Andrew Patterson pleaded guilty to one count of the crime of manslaughter in the first degree with the condition that he testify for the state in its prosecution of the defendant. Bryan Patterson was charged with the crimes of accessory to murder and capital felony and conspiracy to commit murder and capital felony. His case is pending in the Superior Court. See *State* v. *Patterson,* 213 Conn. 708, 570 A.2d 174 (1990).

[8] "[Practice Book] Sec. 758. —— ——NOTICE BY DEFENDANT

"If a defendant intends to rely upon the defense of mental disease or defect at the time of the alleged crime, he shall, within the time provided for the filing of pretrial motions pursuant to Sec. 811 or at such later time as the judicial authority may direct, notify the prosecuting authority in writing of such intention and file a copy of such notice with the clerk. If there is a failure to comply with the requirements of this section, mental disease or defect may not be raised as a defense. The judicial authority may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate."

"[Practice Book] Sec. 759. —— ——MENTAL DISEASE OR DEFECT INCONSISTENT WITH THE MENTAL ELEMENT REQUIRED FOR THE OFFENSE CHARGED

"If a defendant intends to introduce expert testimony relating to a mental disease or defect, or another condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall, within the time provided for the filing of pretrial motions or at such later time as the judicial authority may direct, notify the prosecuting authority in writing of such intention and file a copy of such notice with the clerk. He shall

state filed a motion for a psychiatric examination pursuant to Practice Book § 760. Howard Zonana, a forensic psychiatrist who testified as an expert witness for the state, conducted this examination on June 23, 25 and 30, 1988. At the time of the examination, the defendant was taking vistaril, an antianxiety medication, and lithium, which is primarily used to treat affective disorders by minimizing mood swings. Zonana made videotape recordings of the examination, which ran approximately seven and one-half hours. The state offered the videotapes during rebuttal as an aid to Zonana's testimony and as evidence of the basis for his opinion. Because both Zonana and Peter Zeman, a forensic psychiatrist who testified for the defendant, indicated that they utilized the tapes in reaching their conclusions, the state also argued that the trier of fact could use the videotapes to evaluate those conclusions. The three judge panel admitted the videotapes as a full exhibit over the objection of the defendant and viewed them in their entirety. The defendant did not testify at his trial.

The defendant raises three constitutional claims concerning the use of the videotapes. He contends that their admission into evidence violated his privilege against self-incrimination and his right to due process of law guaranteed by the fifth and fourteenth amendments to the United States constitution and article first, § 8 of the Connecticut constitution, as amended by article seventeen of the amendments to the Connecticut constitution.[9]

also furnish the prosecuting authority with copies of reports of physical or mental examinations of the defendant made in connection with the offense charged, within five days after receipt thereof. The judicial authority may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate."

[9] The defendant has not provided a separate analysis of his rights under the Connecticut constitution. Therefore, we shall consider only his claims under the federal constitution. *State* v. *Mercer,* 208 Conn. 52, 67 n.9, 544 A.2d 611 (1988).

He also appears to argue that his sixth amendment right to counsel was violated by the admission of the tapes. Before we consider the defendant's constitutional claims, however, we must address his argument that a consent form concerning the videotaping, which the defendant executed at the request of Zonana, gave the defendant the prerogative to withdraw his consent to the use of the videotapes at his trial.

## A

Before commencing his first interview with the defendant, Zonana handed him a printed consent form related to the videotaping procedure that was about to take place.[10] Zonana testified that the purpose of the

---

[10] "Yale University *New Haven, Connecticut 06519*
SCHOOL OF MEDICINE
*Department of Psychiatry*
*34 Park Street*

LAW & PSYCHIATRY UNIT
AUDIO-VISUAL PERMISSION FORM
Date _____6/23/88_____

I, ____Eric Steiger____ of _____Suffield_____ hereby consent to a video and audio recording of my interview(s) with _Dr. Zonana_ on _6/23 et seq._
I understand that ~~these recordings are~~ this evaluation is being made at the request of State's Attorney, __Herbert Appleton__ and will be used to prepare my case.

I understand that part or all of these recordings may be played for officers of the court or played during courtroom proceedings.

I also give permission for these recordings to be played by the staff at the Law & Psychiatry Unit for medical/legal professionals engaged in research/training.

I understand that there will be no other disclosure of the contents of the recordings without my written consent.

I understand that I may withdraw this authorization at any time by furnishing written notice thereof to the Law & Psychiatry Unit, 34 Park Street, New Haven, Conn.

I acknowledge receipt of a copy of this authorization form.

_____          /s/ Eric Steiger_____
Witness                          Signature"

consent form was to document that the defendant was aware that the interview was being recorded, to reiterate the oral notice that the videotapes might be played in court, and to obtain the defendant's permission to use the videotapes in the classroom for teaching purposes. He also testified that he would have videotaped the examination even if the defendant had said that he did not want the interview recorded. The defendant completed the form and signed it at Zonana's request.[11] During the trial, the defendant gave written notice to Zonana that he was withdrawing his authorization to allow the use of the videotapes at his trial.[12] The defendant claims that the terms of the consent form gave him that right. The state, on the other hand, argues that the provisions set forth in the form only gave the defendant the right to withdraw his consent to the use of the videotape for teaching purposes and did not permit him to bar the use of the tapes during his trial.

The defendant relies on that portion of the consent form stating that "I understand that I may withdraw this authorization at any time by furnishing written notice thereof to the Law & Psychiatry Unit . . . ." He argues that this provision gave him the right to deny the state the ability to use the videotapes during trial. The defendant's interpretation of this provision is not

---

[11] In addition, at the beginning of each of his three interviews with the defendant, Zonana reminded him that he had been hired by the state to conduct the examination, that the examination was not confidential, and that the videotape might be played during the trial. The defendant agreed to these conditions before each interview, and at several points during the examination he expressed concern about discussing certain matters in full detail because the tapes might be played in court.

[12] During the hearing concerning the admissibility of the videotapes, the state argued that even if the defendant had the power to withdraw his consent for the use of the tapes during the trial, the defendant had not established that timely notice of the withdrawal was provided in accordance with the procedure set forth in the form. In light of our disposition of the consent issue, we do not need to address this factual issue.

reasonable, however, when the consent form is read as a whole. The form also provides that "I *understand* that part or all of these recordings may be played for officers of the court or played during courtroom proceedings" and "I also *give permission* for these recordings to be played by the staff at the Law & Psychiatry Unit for medical/legal professionals engaged in research/training." (Emphasis added.) The state contends that the proper interpretation of the consent form is that the authorization sought was to use the tapes for teaching purposes and the defendant therefore retained only the right to withdraw his permission to use the tapes for that purpose. Considering the differences in the terminology used in the consent form in the provisions concerning the use of the tapes in the courtroom and for teaching purposes, we agree with the state's interpretation. We also conclude that, in the absence of any express right granted to the defendant under the consent form, the state was not required to seek his permission to use the tapes at trial.

B

The defendant next claims that the admission into evidence of the videotapes of the psychiatric examination compelled him to testify against himself because the tapes depicted his demeanor, manner of speaking, facial expressions and body language during the examination as well as his verbal responses to Zonana's questions. The state argues that the use of the videotapes as a basis for Zonana's opinion did not violate the defendant's constitutional guarantee against self-incrimination. We agree.

Practice Book § 760 provides that "the judicial authority may . . . order the defendant to submit to a psychiatric examination" and that "[n]o statement made by the defendant in the course of any examina-

tion . . . shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding."[13] "The constitutionality of a compulsory psychiatric examination depends upon whether the defendant has placed his mental status in issue. The fifth amendment to the United States constitution and article first, § 8, of the Connecticut constitution ordinarily protect 'an accused against compulsory submission to psychiatric examination.' *State* v. *Lovelace,* 191 Conn. 545, 550, 469 A.2d 391 (1983), cert. denied, 465 U.S. 1107, 104 S. Ct. 1613, 80 L. Ed. 2d 142 (1984), citing *Estelle* v. *Smith,* 451 U.S. 454, 468, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981). A criminal defendant waives this privilege, however, when he places his mental status in issue. '[T]he defendant may decide whether to raise the issue of his mental state but if he chooses to do so he exposes his mental processes to reasonable examination by the state.' *State* v. *Lovelace,* supra, 551–52." *State* v. *Fair,* 197 Conn. 106, 109, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1986); *State* v. *Manfredi,* 213 Conn. 500, 513, 569 A.2d 506, cert. denied,     U.S.    , 111 S. Ct. 62, 112 L. Ed. 2d 37 (1990).

The issue raised by the defendant's claim of self-incrimination is not whether the defendant can be compelled to submit to a psychiatric examination. It involves instead the extent to which the fifth amendment protects a criminal defendant against the admission of evidence concerning the results of a psychiatric examination conducted pursuant to Practice Book § 760. "[I]f a defendant requests [a psychiatric] evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with

[13] There is no question in this case that the videotapes of the psychiatric examination were introduced solely on the issue of the defendant's mental status. There was no dispute at trial that the defendant had shot Seymour and Price on July 11, 1987.

evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution." *Buchanan* v. *Kentucky,* 483 U.S. 402, 422-23, 107 S. Ct. 2906, 97 L. Ed. 2d 336, reh. denied, 483 U.S. 1044, 108 S. Ct. 19, 97 L. Ed. 2d 807 (1987); *Powell* v. *Texas,* 492 U.S. 680, 684, 109 S. Ct. 3146, 106 L. Ed. 2d 551 (1989) (per curiam). In *Buchanan,* the court held that the defendant's privilege against self-incrimination was not violated when excerpts from a report containing a psychiatrist's general observations concerning the defendant's mental status were read to the jury. *Buchanan* v. *Kentucky,* supra, 421-24. The court stated that "with [the defendant] not taking the stand, the Commonwealth could not respond to this defense unless it presented other psychological evidence." Id., 423.

In *State* v. *Manfredi,* supra, 513, we stated that "[a] defendant effectively places his mental status in issue for fifth amendment purposes by filing notice of intent to rely on a defense of insanity or extreme emotional disturbance." "Once a defendant has waived the privilege [against self-incrimination by placing his mental status in issue], the state may require him to submit to a psychiatric examination, and the results of such an examination may be introduced at trial for the purpose of rebutting the defendant's mental status defenses." Id.

In arguing that his privilege against self-incrimination was violated, the defendant does not rely on the fact that the videotapes contain statements he made during the examination.[14] Rather, he claims that the admis-

---

[14] Several United States Circuit Courts of Appeal have ruled that if a defendant places his mental state at issue, statements made by the defendant during a psychiatric examination are not protected by the privilege against self-incrimination if used solely on the issue of the defendant's mental state.

sion of the videotapes violated his fifth amendment right because the videotapes memorialized not only his verbal responses to Zonana's questions but also depicted his demeanor while answering those questions. The issue, therefore, is whether the exhibition at trial of the videotapes is within the scope of the fifth amendment waiver made by the defendant when he placed his mental status in issue. Before addressing that question, however, we must determine whether the defendant's demeanor during the examination is a testimonial act to which the privilege against self-incrimination applies or whether, as the state contends, it constitutes "real or physical evidence" beyond the scope of that privilege. See, e.g., *United States* v. *Dionisio,* 410 U.S. 1, 5–7, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973) (voice exemplar unprotected); *Schmerber* v. *California,* 384 U.S. 757, 760–65, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) (blood sample unprotected).

"[T]he Fifth Amendment is not violated where the evidence given by a defendant is neither related to some communicative act nor used for the testimonial content of what was said." *Estelle* v. *Smith,* supra, 463. By implication, evidence given by a defendant that is related to a communicative act or used for its testimonial content is subject to the limitations of that amendment. A demand made upon an accused is testimonial in nature if an " 'attempt is made to secure a communication—written, oral or otherwise—upon which reliance

Schneider v. *Lynaugh,* 835 F.2d 570, 575–77 (5th Cir.), cert. denied, 488 U.S. 831, 109 S. Ct. 87, 102 L. Ed. 2d 63 (1988); *United States* v. *Stockwell,* 743 F.2d 123, 125 (2d Cir. 1984); *United States* v. *Byers,* 740 F.2d 1104, 1109–15 (D.C. Cir. 1984) (plurality opinion) (Scalia, J.); *United States* v. *Halbert,* 712 F.2d 388, 389–90 (9th Cir. 1983), cert. denied, 465 U.S. 1005, 104 S. Ct. 997, 79 L. Ed. 2d 230 (1984); *United States* v. *Madrid,* 673 F.2d 1114, 1118–21 (10th Cir.), cert. denied, 459 U.S. 843, 103 S. Ct. 96, 74 L. Ed. 2d 88 (1982); *United States* v. *Albright,* 388 F.2d 719, 725–26 (4th Cir. 1968).

is to be placed as involving [the accused's] consciousness of the facts *and the operations of his mind in expressing it . . . .' "* (Emphasis added.) *Pennsylvania* v. *Muniz,* 496 U.S.    , 110 S. Ct. 2638, 2646–47, 110 L. Ed. 2d 528 (1990).[15] Zonana testified that his diagnosis of the defendant was made on the basis of the content of the statements made to him by the defendant during the psychiatric examination *and* the defendant's demeanor while making those statements. In light of this testimony, it is clear that Zonana used the defendant's demeanor in evaluating the operation of the defendant's mind. We conclude, therefore, that in this instance the defendant's demeanor was testimonial.[16] See *Schneider* v. *Lynaugh,* 835 F.2d 570,

[15] In *Pennsylvania* v. *Muniz,* 496 U.S.    , 110 S. Ct. 2638, 2644–49, 110 L. Ed. 2d 528 (1990), the court held that a response to a question posed to a person suspected of drunken driving is testimonial if the incriminating inference of mental confusion arises from the content of the response rather than from its slurred delivery. The court noted that the slurring of speech was an indication of a lack of muscular coordination of the tongue and mouth, and therefore constituted real or physical evidence. Id., 2644–45.

[16] Our conclusion is further supported by the fact that "[a]t its core, the privilege [against self-incrimination] reflects our fierce ' "unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt." ' [*Doe* v. *United States,* 487 U.S. 201, 212, 108 S. Ct. 2341, 101 L. Ed. 2d 184 (1988)]." *Pennsylvania* v. *Muniz,* 496 U.S.    , 110 S. Ct. 2638, 2647, 110 L. Ed. 2d 528 (1990). Most defendants will understand that what they say and how they act during a psychiatric examination will affect their chances of successfully asserting an insanity defense. See *United States* v. *Byers,* 740 F.2d 1104, 1153 (D.C. Cir. 1984) (Bazelon, J., dissenting). "The pressure on defendants to lie or to feign what they conceive of as insane symptoms will be intense, even for those whose insanity defenses are legitimate. Even the truly mentally ill person is likely to have some stereotyped conception of what distinguishes sanity from insanity and to manifest symptoms of the latter." Id. Because a refusal to cooperate with the psychiatrist would likely lead to a forfeiture of an accused's right to assert an insanity defense, a defendant in such a situation faces the cruel trilemma of "confessing responsibility, feigning insanity or forfeiting the affirmative defense." Id., 1154.

We also recognize, however, that some aspects of an examination by a psychiatrist might not involve information testimonial in nature. X-rays, blood and urine tests and electroencephalograms, for example, seek only real or physical evidence. Id., 1148.

573–77 (5th Cir.), cert. denied, 488 U.S. 831, 109 S. Ct. 87, 102 L. Ed. 2d 63 (1988) (psychiatrist's testimony included description of the defendant's demeanor during examination).

The defendant concedes that Zonana could have testified concerning his statements made during the course of the psychiatric examination and about observations of his demeanor during the examination without violating the fifth amendment because, by placing his mental state in issue, he had waived his privilege to that extent. We see no logical reason why the defendant's waiver of his fifth amendment rights would permit the state to introduce Zonana's testimony concerning the defendant's verbal responses and demeanor manifested during the psychiatric examination, yet not permit the state to introduce into evidence videotapes of that same examination. Because the results of a psychiatric examination conducted pursuant to Practice Book § 760 can be introduced at trial through the examiner to rebut a mental status defense raised by a defendant; *State v. Manfredi,* supra; see *Buchanan v. Kentucky,* supra; we do not find persuasive the defendant's claim that the introduction of the videotapes violated his privilege against self-incrimination. The tapes did nothing more than depict what Zonana could have testified to himself. Cf. *State v. Wampler,* 30 Or. App. 931, 569 P.2d 46, 49 (1977), cert. denied, 436 U.S. 960, 98 S. Ct. 3078, 57 L. Ed. 2d 1126 (1978) (denying the defendant's claim that the admission of videotapes of a psychiatric examination violated his rights under the fifth amendment when the examination was conducted and videotaped at his request and at trial he admitted committing the offense charged).

C

The defendant also contends that the state's use of the videotapes violated his right to a fair trial under

the due process clause of the fourteenth amendment. In support of this claim the defendant asserts that: (1) he was entitled to the presence of counsel during the psychiatric examination if the tapes of the examination were to be admitted at his trial; (2) in its role as factfinder the three judge panel did not possess the skill, training or experience to evaluate the videotapes properly as a basis for Zonana's opinion because the videotapes were made approximately one year after the shootings while the defendant was in a controlled environment and under the influence of medication; (3) Zonana was competent to testify concerning the basis for his opinion without the use of the videotapes; (4) the videotapes were not relevant because Zonana's testimony did not rebut the defendant's evidence concerning his mental state; and (5) the videotapes were used as independent evidence on the issue of the defendant's mental status. The state contends that the admissibility of the videotapes was an evidentiary rather than a constitutional issue, and that the three judge panel did not abuse its discretion in admitting the videotapes. We agree.

The defendant's claim that his right to a fair trial under the due process clause gave him the right to have counsel present during the psychiatric examination is without merit. The defendant is unable to cite any case law supporting his claim that an accused who has placed his mental state in issue and who has been compelled to undergo a psychiatric examination has a right to the presence of counsel under the due process clause of the fourteenth amendment. We therefore reject this claim as without authority.[17] Indeed, as is discussed more

---

[17] Although the defendant's brief is sketchy and not entirely clear on this point, he does not appear to be relying on the right to counsel under the doctrine of *Miranda* v. *Arizona*, 384 U.S. 436, 469–73, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Even if he is relying on the *Miranda* doctrine, the defendant waived those rights when he placed his mental status in issue.

fully below, the authority concerning whether a defendant has a right to counsel at a psychiatric examination under the sixth amendment is to the contrary. See *Powell* v. *Texas,* supra, 683–85; *Buchanan* v. *Kentucky,* supra, 424–25.

The defendant contends that before we conclude that the videotapes were admissible, we must examine *State* v. *Johnson,* 14 Conn. App. 586, 588–94, 543 A.2d 740 (1988), in which the Appellate Court held that neither the sixth amendment to the federal constitution nor article first, § 8 of the Connecticut constitution provides a criminal defendant with the right to counsel at psychiatric examinations conducted pursuant to Practice Book § 760.[18] The Appellate Court concluded that the right to counsel was not implicated because a defendant was not required during a psychiatric examination to make any decisions requiring "distinctively legal advice" and because the examining psychiatrist was not equivalent to a professional adversary representing the state. Id., 590–94. Here, the defendant argues, that is not the case.

We have examined *State* v. *Johnson,* supra, and conclude that its analysis of a defendant's right to counsel during a psychiatric examination also applies to cases such as this where the state introduces videotapes of the psychiatric examination into evidence. The defendant argues against such a conclusion by alleging that: (1) he needed the assistance of counsel in completing the consent form; (2) Zonana had no established

See *Buchanan* v. *Kentucky,* 483 U.S. 402, 422–23, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987); *State* v. *Manfredi,* 213 Conn. 500, 513, 569 A.2d 506 (1990).

[18] Zonana was one of the psychiatrists who performed the psychiatric examinations at issue in that case, and he videotaped those examinations as well. Those videotapes, however, were not introduced into evidence. *State* v. *Johnson,* 14 Conn. App. 586, 597–600, 543 A.2d 740 (1988).

procedures governing the videotaping, did not tape the entire examination and was not visible on the video-tape; and (3) Zonana assumed the role of a prosecutor when he questioned the defendant during the examination.

As noted previously, we conclude that the consent form sought only the defendant's authorization to use the videotapes for teaching purposes. That decision did not require that the defendant receive distinctively legal advice, and therefore cannot support the defendant's sixth amendment claim. See *United States* v. *Ash,* 413 U.S. 300, 313, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973). With respect to the defendant's concerns about the lack of formalized procedures for videotaping, we note that Zonana testified that since he began videotaping in 1980 he has recorded every psychiatric examination related to a determination of criminal responsibility. The defendant's desire for more formalized procedures, while possibly relevant to the three judge panel's evidentiary ruling on admissibility, hardly gives rise to a constitutional claim. Finally, in *State* v. *Johnson,* supra, 591–93, the Appellate Court thoroughly explained why a psychiatrist conducting an examination pursuant to Practice Book § 760 is not analogous to a prosecutor.

When a criminal defendant places his mental state in issue, the relevant concern as to his sixth amendment right to counsel is whether he had an opportunity before the examination to consult with counsel about the nature and scope of the examination. *Powell* v. *Texas,* supra, 683–85; *Buchanan* v. *Kentucky,* supra, 424–25. The effectiveness of the consultation depends on the attorney's knowledge of the uses to which the results of the examination can be put. *Buchanan* v. *Kentucky,* supra. Because the defendant filed his notice of defense of mental disease or defect approximately

seven months before the psychiatric examination, we can safely assume that the defendant's experienced and highly competent counsel knew that the results of the state's psychiatric examination could be used in rebuttal and informed the defendant of the potential nature and scope of the state's examination.[19] See id. We therefore conclude that the defendant had no right under the sixth amendment to the presence of counsel at the examination itself.

The defendant next argues that the three judge panel lacked the expertise to evaluate the videotapes as the basis for Zonana's opinion concerning the defendant's mental status on July 11, 1987, the date of the crimes, because the examination occurred nearly one year later when the defendant was in a controlled setting and was taking medication. In support of this argument, the defendant relies on several decisions upholding refusals to admit into evidence tape recordings or videotapes of psychiatric examinations of criminal defendants where the recordings were offered by the defendant to show the basis for an expert's opinion. *Eaton* v. *State,* 394 A.2d 217, 219–20 (Del. 1978) (tape recording); *State* v. *Garcia,* 233 Kan. 589, 597–601, 664 P.2d 1343 (1983) (videotape of examination conducted two months after commission of crime); *State* v. *White,* 60 Wash. 2d 551, 568–69, 374 P.2d 942 (1962), cert. denied, 375 U.S. 883, 84 S. Ct. 154, 11 L. Ed. 2d 113 (1963) (tape recording of defendant while under the

---

[19] It is of no consequence whether the defendant's attorney was aware that Zonana videotaped his examinations as a matter of procedure. The sixth amendment requires only that the defendant be informed of the nature and scope of the examination itself, not the particular means used to record the examiner's observations. See *Buchanan* v. *Kentucky,* 483 U.S. 402, 424–25, 107 S. Ct. 2906, 97 L. Ed. 2d 336 (1987). Even if notice was relevant, the defendant's counsel had constructive notice that Zonana videotaped his examinations because that procedure was discussed in *State* v. *Johnson,* 14 Conn. App. 586, 597–98, 543 A.2d 740 (1988), and that decision was released prior to Zonana's examination.

influence of a truth serum). Although these cases provide some support for the proposition that laypersons may find it difficult to evaluate videotape recordings of psychiatric examinations properly, they do not support the defendant's contention that the admission of the videotapes was necessarily a due process violation. The issue in each of the cases cited was evidentiary in nature, namely, whether the trial court had abused its discretion in *refusing* to admit the recording. In none of those cases did the defendant claim that his due process rights were violated by the exclusion of the recording.[20]

"As in all cases involving what is or is not due process, so in this case, no hard and fast rule can be laid down. The pattern of due process is picked out in the facts and circumstances of each case." *Brock* v. *North Carolina,* 344 U.S. 424, 427–28, 73 S. Ct. 349, 97 L. Ed. 456 (1953); *State* v. *Lovelace,* supra, 552. While we do not hold that the admission of a videotape recording of a psychiatric examination of a defendant who has placed his mental status in issue can never give rise to a due process claim, we find no due process violation in this case, especially in light of the fact that the three judge panel was aware that the videotapes were made nearly one year after the crimes, while the defendant was on medication. In addition, its decision

---

[20] The fact that here it was the defendant, not the state, who sought to exclude the videotapes makes this case anomalous. The procedure of videotaping psychiatric examinations has been cited as a means of providing safeguards for criminal defendants. *United States* v. *Byers,* 740 F.2d 1104, 1155–57 (2d Cir. 1984) (Bazelon, J., dissenting); see *Hendricks* v. *Swenson,* 456 F.2d 503, 506 (8th Cir. 1972) (videotape of the defendant's statements to police).

We do not hold that a psychiatrist is constitutionally required to record psychiatric examinations conducted pursuant to Practice Book § 760. Furthermore, we do not hold that if recordings of psychiatric examinations are made, a defendant is necessarily entitled to have such recordings admitted into evidence.

demonstrates that it properly considered the defendant's mental state on July 11, 1987. We reject the defendant's contention that, as a matter of law, the three judge panel was not competent to evaluate those factors in its consideration of the videotapes. The defendant's position is contrary to the broad latitude we have traditionally accorded the trier of fact in evaluating expert opinion and the basis for such opinion. See *State* v. *Evans,* 203 Conn. 212, 238–39, 523 A.2d 1306 (1987); *In re Juvenile Appeal (Docket No. 9268),* 184 Conn. 157, 170–71, 439 A.2d 958 (1981); *State* v. *Perez,* 182 Conn. 603, 610, 438 A.2d 1149 (1981). The state, therefore, properly characterizes the issue concerning the admissibility of the videotapes as an evidentiary, not a constitutional, question.

It is well established that an expert witness can be examined concerning the factual basis of his opinion. *United States* v. *Madrid,* 673 F.2d 1114, 1120–21 (10th Cir.), cert. denied, 459 U.S. 843, 103 S. Ct. 96, 74 L. Ed. 2d 88 (1982) (defendant's statements during psychiatric examination admissible as basis for expert opinion); *Rollerson* v. *United States,* 343 F.2d 269, 271 (D.C. Cir. 1964); *State* v. *Douglas,* 203 Conn. 445, 452–53, 525 A.2d 101 (1987); *State* v. *Asherman,* 193 Conn. 695, 716–17, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *Garcia,* supra, 599; 31A Am. Jur. 2d, Expert and Opinion Evidence § 75. In cases where the defendant places his mental status in issue, the basis for a psychiatric expert's opinion is one of the things that the trier of fact may consider in evaluating the testimony of that expert. *State* v. *Perez,* supra. The state offered the videotapes during rebuttal[21] to demonstrate the

[21] The defendant claims that the testimony of Zonana did not conflict with the testimony of Zeman and therefore that the videotapes were not relevant to rebut Zeman's testimony. This argument has no merit. As will be

basis for Zonana's opinion and as an aid to understanding his testimony.[22] The state also argued that, because Zeman relied on the tapes as well, the videotapes provided the trier of fact with a means for evaluating both experts' conclusions. Because the admissibility of the tapes was an evidentiary question, we cannot reverse the decision of the three judge panel to admit the tapes unless we conclude that the panel abused its discretion or committed a clear error involving a misconception of the law. See *State* v. *Douglas,* supra, 452; *State* v. *Palmer,* 196 Conn. 157, 166, 491 A.2d 1075 (1985); *State* v. *Asherman,* supra, 716; *Eaton* v. *State,* supra, 220.

In *State* v. *Carter,* 198 Conn. 386, 389–95, 503 A.2d 576 (1986), we held that the trial court had not abused its discretion in permitting the state to introduce evidence of a prior conviction of the defendant in order to rebut the defense of insanity. We stated that " '[w]henever insanity is asserted as a defense and is supported by any credible evidence, "it is of critical importance that the defendant's entire relevant symptomology [sic] be brought before the jury . . . ." "[W]hen insanity is in issue, any and all conduct of the person is admissible in evidence." To this end, the trial judge should permit "an unrestricted inquiry into the whole personality of a defendant" and should "be free in his admission of all possibly relevant evidence." . . .' " Id., 392, quoting *United States* v. *Smith,* 507 F.2d 710, 711 (4th Cir. 1974); see also *United States* v. *Alexander,* 805 F.2d 1458, 1464 (11th Cir. 1986).

We conclude that the liberal approach applied in *State* v. *Carter,* supra, to the admission of evidence bearing

---

discussed more fully below, Zonana and Zeman did in fact disagree over the correct diagnosis of the mental disease or defect with which the defendant was afflicted.

[22] Zonana testified that having the trier of fact watch the videotapes would aid him in explaining the conclusions that he reached.

on the issue of a defendant's mental state controls the present case as well. The panel did not abuse its discretion in concluding that the videotapes were relevant to the issue of the defendant's mental status on July 11, 1987, and were admissible for use by the state in illustrating and corroborating the testimony of Zonana. Because both Zonana and Zeman relied in part on the videotapes in making their diagnoses, the videotapes were clearly relevant to the crucial issue in this case, namely, the defendant's mental status. Although the videotapes were made nearly one year after the commission of the crimes at a time when the defendant was taking medication, those facts alone do not require a conclusion that the three judge panel abused its discretion by admitting them into evidence. The panel was aware of those facts and it implicitly concluded, when it admitted the videotapes, that the probative value of the videotapes outweighed any risk of a prejudicial effect.[23] Moreover, the memorandum of decision demonstrates that the panel, in evaluating the defendant's claims concerning his mental state, properly focused on his mental state at the time of the crimes, rather than at the time of the psychiatric examination.[24]

---

[23] Among the cases cited by the three judge panel in its oral decision on the admission of the videotapes was *State* v. *DeJesus,* 194 Conn. 376, 384–85, 481 A.2d 1277 (1984), where we stated that photographic evidence illustrating or corroborating testimony by an expert is admissible if its probative value outweighs its prejudicial effect.

[24] The state made the following statements during closing argument:

"And I would suggest to Your Honor, the most persuasive evidence we've had on [the issue of insanity] came in the form of the tapes. . . . He remembered everything [concerning the events of July 11, 1987,] precisely as it happened and gave what perhaps was the most reliable account. . . . We had a very well organized, logical and dispassionate account of what happened. . . . Is that an insane person? After seven and a half hours can you look at that and say that this guy was insane? Is insane? I suggest not. . . . I suggest to you that seven and a half hours of tapes gives a powerful message to all of us, anybody who watched it, that this was a sane individual."

The defendant argues that these remarks reveal that the state actually introduced the videotapes not to show the basis of Zonana's opinion, but

The defendant also asserts that the videotapes were inadmissible because Zonana was capable of testifying concerning the basis of his opinion without relying on the tapes. This argument misrepresents the standard to be applied in determining whether video recordings of psychiatric examinations are admissible when the defendant has raised his mental status as a defense. The question is not whether the psychiatrist has a clear recollection of the examination and could possibly testify without the tapes, but rather whether the probative value of the tapes outweighs the risk that the trier of fact might not be able to consider and weigh their relevance properly. *Eaton* v. *State,* supra; *State* v. *Garcia,* supra, 600–601; *People* v. *Furman,* 158 Mich. App. 302, 326–27, 404 N.W.2d 246, appeal denied, 429 Mich. 851 (1987); *State* v. *White,* supra, 568; see *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 323–24, 430 A.2d 1 (1980) (videotape admitted in civil action); *State* v. *Piskorski,* 177 Conn. 677, 699–702, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979) (admission of photographs of homicide victims); *State* v. *Harris,* 241 Or. 224, 241, 405 P.2d 492 (1965) (tape recording of defendant's statements to physician).

rather as independent evidence on the issue of insanity. Although evidence admitted to demonstrate the basis of an expert opinion is not independent evidence; 31A Am. Jur. 2d, Expert and Opinion Evidence § 75; the trier of fact is entitled to consider the basis of a psychiatrist's opinion in determining what weight to give such testimony. *State* v. *Perez,* 182 Conn. 603, 610, 438 A.2d 1149 (1981). Because both Zeman and Zonana relied in part on the videotapes in reaching their separate conclusions, the three judge panel could have used videotapes in evaluating those same opinions. The oral decision of the panel to admit the tapes reveals that the panel was aware of the proper evidentiary role of the tapes.

We do note that some of the statements made during the state's closing argument appear to suggest that the trier of fact should have considered the defendant's mental state on the date of the interview, rather than the date of the shooting. The memorandum of decision, however, clearly indicates that the three judge panel was not misled by these remarks.

## II

The defendant also challenges the conclusion of the three judge panel that the defendant did not prove his affirmative defenses of insanity and extreme emotional disturbance by a preponderance of the evidence and that the state proved beyond a reasonable doubt that the defendant acted with the intent to cause the deaths of the victims.

To consider these claims properly, we must necessarily summarize the voluminous evidence presented by the defendant and the state concerning the defendant's mental state. Anne Phillips, a clinical psychologist called by the defendant, testified that on July 11, 1987, the defendant was suffering from schizophrenia with paranoid trends. Phillips indicated that this illness was marked by the defendant's extreme use of fantasy as a retreat from reality and that his hold on reality was so tenuous that his fantasies could take on delusional qualities. Phillips stated that the defendant was constantly on the defensive against personal insult,[25] that interpersonal conflict aroused overwhelming emotions in him, and that it was likely he would engage in impulsive behavior or disordered thought if he felt insulted, rejected or physically threatened. Phillips testified that as a result of this mental illness the defendant lacked substantial capacity to control his conduct within the requirements of the law on the night in question and that he committed the shootings while under the influence of an extreme emotional disturbance.

The defendant also presented the testimony of Zeman, who concluded that on July 11, 1987, the defendant was suffering from a long-standing severe

---

[25] The defendant felt he had been humiliated during a confrontation that occurred approximately two years before the shootings, when he had been hit in the chest and throat with a club in front of a small crowd.

mental illness of psychotic proportions. His diagnosis of this illness was schizophrenia, paranoid type, chronic. Zeman further testified that because of his illness the defendant lacked substantial capacity either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. Zeman stated that the defendant was also extremely emotionally disturbed at the time of the shootings.

Additionally, Zeman confirmed Phillips' testimony that the defendant is subject to severe stress when he feels threatened. Zeman concluded that as a result of the altercation at the cul-de-sac and pressure from Andrew Patterson to carry out "the offensive," the defendant became very agitated, was in an extremely disorganized state of mind and lost contact with reality. Zeman opined that at the time of the shooting of Seymour and Price the defendant was in a dissociative state during which his ability to control his actions was severely limited. Zeman was satisfied that the defendant actually believed that he was on "the offensive" and that his action was a justified mission to rid Suffield of "terrorists" endangering the town.

Zonana testified in rebuttal for the state. He concluded that on the night of the shootings the defendant was suffering from a mixed personality disorder, in that he met the criteria for several personality disorders, including antisocial, paranoid and features of schizotypal and narcissistic. Zonana specifically found that the defendant's mental disorder, although capable of reaching psychotic proportions affecting his ability to "reality test," did not satisfy the criteria for a schizophrenic disorder.[26] Moreover, Zonana testified

---

[26] At the request of Zonana, Madelon Baronoski, a clinical psychologist, wrote a report that the state introduced into evidence. This report was prepared by analyzing the results of the psychological testing performed by Phillips. Like Zonana, Baronoski concluded that the defendant suffered from

that he did not find credible the defendant's assertions that he believed the victims were terrorists because during all the years that he had planned "the offensive" he knew it was illegal. Ultimately, however, Zonana was unable to reach a conclusion as to whether the defendant's mental disorder rendered him incapable of appreciating the wrongfulness of his conduct or of controlling his behavior on July 11, 1987.[27] Zonana was never asked to evaluate whether the defendant was under the influence of an extreme emotional disturbance the night of the crimes.

"[W]e have repeatedly stated that our review of the conclusions of the trier of fact, whether it be a judge, a panel of judges or a jury, is limited. See, e.g., *State v. Brice*, 186 Conn. 449, 459, 442 A.2d 906 (1982); *State v. D'Antuono*, 186 Conn. 414, 421, 441 A.2d 846 (1982); *In re Juvenile Appeal (Docket No. 9268)*, [supra, 169];

a mixed personality disorder, rather than schizophrenia, and that there were situations in which the defendant exhibited poor "reality testing" and disorganized thinking. The report also indicated that in a threatening situation, "[h]is emotional lability, limited coping responses, and sense of vulnerability can result in explosive behavior." This report did not reach any specific conclusions concerning the defendant's mental state on July 11, 1987.

[27] In his report on his psychiatric examination of the defendant, Zonana stated: "What makes the present situation so difficult to evaluate is that [the defendant] has been practicing and fantasizing many variations of war games with Andrew Patterson for years. . . .

"The shootings after being hit in the face were the result of the confluence of a number of factors. He clearly was angry and wanted some form of revenge or face saving maneuver. How much his disorder played a role in his actions is very difficult to quantify. This is not a case of a clearly deteriorating psychotic condition over a period of days or weeks with command hallucinations and fixed delusions. On the other hand, in the face of external pressure Mr. Steiger can regress with some impairment to his reality testing. His state of mind at the time in terms of his ability to appreciate the wrongfulness or to conform his behavior to the requirements of law is difficult to determine because of the variability of the degree of intrusiveness of his mental disorder, his longstanding antisocial traits, impulsivity, and preoccupation with weapons and war games."

*State* v. *Perez,* supra, 606. 'This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same.' (Citations omitted.) *State* v. *D'Antuono,* supra . . . ." *State* v. *Evans,* supra, 238. The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact. Id. "In its consideration of the testimony of an expert witness, the trial court might weigh, as it sees fit, the expert's 'expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them.' *State* v. *Perez,* supra, 610." *In re Juvenile Appeal (Docket No. 9268),* supra, 170; *State* v. *Evans,* supra, 238–39. Applying these standards of review, we conclude that each of the defendant's challenges to the factual findings of the three judge panel should be rejected.

In examining the basis for this conclusion, we consider together the defendant's claims that the state failed to prove beyond a reasonable doubt that he intended to cause the deaths of Seymour and Price and that he did prove by a preponderance of the evidence the affirmative defense of insanity. Section 53a-54a (b) states that "[e]vidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person." Section 53a-13 (a) provides that "[i]n any prosecution for an offense, it shall be an affirmative defense that the

defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law." While the defendant must prove the affirmative defense of insanity by a preponderance of the evidence, the state, in order to obtain a murder conviction, has the burden of proving beyond a reasonable doubt that the defendant intended to cause the death of the victims. See General Statutes § 53a-12.[28]

We first note that although the psychiatric and psychological experts agreed that the defendant was suffering from a mental disease or defect on July 11, 1987, only Phillips and Zeman concluded that the defendant suffered from schizophrenia on that date.[29] Both Zonana and Baronoski diagnosed the defendant's disease as a mixed personality disorder and both specifically rejected a diagnosis of a schizophrenic disorder.[30] One of the bases for Zonana's and Baronoski's

---

[28] "[General Statutes] Sec. 53a-12. DEFENSES; BURDEN OF PROOF. (a) When a defense other than an affirmative defense, is raised at a trial, the state shall have the burden of disproving such defense beyond a reasonable doubt.

"(b) When a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence."

[29] Zonana stated that a mixed personality disorder could provide the basis for a legitimate insanity defense, but in this case he could not reach any conclusion on this issue.

[30] Additional evidence concerning the defendant's mental state indicated that the defendant suffered from a long-standing disorder, but provided no conclusive evidence on what type of disorder it was. When the defendant was discharged from the Marines in 1981, shortly after enlisting, he was diagnosed as suffering from an adjustment disorder with mixed disturbance of emotions and conduct and a mixed personality disorder. The defendant consulted Kenneth Colby, a clinical psychologist, shortly after his discharge, and subsequently was admitted to Bay State Medical Center in October, 1981, for psychiatric help. Colby diagnosed the defendant

rejection of the diagnosis of paranoid schizophrenia was the lack of evidence that the defendant was preoccupied with "systematized delusions."[31] The issue of delusions and of the defendant's ability to "reality test" is important because Zeman concluded that when the defendant committed these acts he actually believed he was on a justified mission to kill terrorists. Zonana concluded, however, that the defendant knew the victims were not terrorists and that the events that evening might have turned out differently if the victims had simply "backed off" or had not been so threatening.

Because the trier of fact can disbelieve any or all of the evidence on insanity and can construe that evidence in a manner different from the parties' assertions; *State* v. *Evans,* supra, 238–39; *State* v. *Gordon,* 185 Conn. 402, 409, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State* v. *Smith,* 185 Conn. 63, 73–74, 441 A.2d 84 (1981); the fact that both of the defendant's experts supported his claim of insanity while the state's expert could not render an opinion on that issue does not establish that the trier of fact could not reasonably have concluded that the defendant did not prove insanity by a preponderance of the evidence. A review of the testimony of other witnesses concerning the defendant's conduct on the night that Seymour and Price were killed reveals significant support for the panel's conclusion that the defendant intended to cause the death of the victims, that he appreciated the wrongfulness of his conduct and

as possibly suffering from paranoid schizophrenia. Bay State Medical Center concluded that the defendant was afflicted with an adjustment disorder and a mixed personality disorder. In May, 1987, a social worker at an alcoholism services clinic to which the defendant had been referred concluded that the defendant exhibited paranoid thinking with violent thoughts and expressed concern over the potential for a violent emotional outburst.

[31] Zonana stated that "systematized delusions" are fixed false beliefs that cannot be altered by education or information and that share a specific theme.

that he was able to control his conduct within the requirements of the law. For example, the defendant vowed that he was going to kill the victims shortly after the altercation on Kingfisher Lane. He repeated this threat when he returned to his home. Thereafter, he was in sufficient control of himself to form a plan to kill the victims in order to exact revenge and to make preparations to carry out that plan. His preparations included ordering the women to leave, telling Bryan Patterson to distract his mother, instructing Andrew Patterson to be careful loading the weapons to ensure that the weapons would function properly, and accepting the offer of a police scanner.

The testimony concerning the defendant's conduct also demonstrates that he was aware of the wrongful nature of his behavior. While returning to Kingfisher Lane, the defendant warned Andrew Patterson to slow down so that they would not be stopped by the police. Further, Zonana indicated that the defendant's expressed plan to commit suicide after the killings demonstrates that he was aware of the illegality of his acts. Additionally, after the shootings the defendant asked Bryan Patterson to dispose of the web ammunition belt by throwing it into the Connecticut River. Finally, during a conversation with his father at the police station after he was taken into custody, the defendant told his father that if the police were aware that he had gone back to Kingfisher Lane with a gun after the original confrontation, "then that's two counts of felony murder."

The three judge panel also could reasonably have determined from the evidence that at the time of the shootings the defendant was not in a delusional state in which he thought that the victims were terrorists. The defendant never mentioned terrorists to anyone before or during the shootings. The defendant fired a

warning shot after rolling out of the car and later, while giving a statement to the police, expressed surprise that the victims had kept coming toward him. Further, Zonana, who did not believe the defendant's claim that he thought the victims were terrorists, opined that the killings might not have occurred had Seymour and Price retreated. Moreover, the defendant was able to distinguish the victims on whom he sought revenge from Mrs. Seymour and Diane Seymour, whom he threatened but did not attempt to harm. Furthermore, the three judge panel could have taken into account the fact that the defendant possessed a psychological manual and, in 1984, had told Andrew Patterson that if he was apprehended after "the offensive" he would plead insanity. We therefore reject the defendant's challenges to the panel's factual findings concerning the affirmative defense of insanity and the defendant's intent to kill.

The defendant also challenges the panel's finding that he did not prove the affirmative defense of extreme emotional disturbance by a preponderance of the evidence. Under § 53a-54a (a), the two elements of this affirmative defense are: (1) that the defendant committed the offense while under the influence of extreme emotional disturbance; and (2) that there was a reasonable explanation or excuse for the extreme emotional disturbance. *State* v. *Forrest,* 216 Conn. 139, 148, 578 A.2d 1066 (1990). "In the final analysis . . . the ultimate determination of the presence or absence of extreme emotional disturbance [is] one of fact for the trier, aided by the expert testimony of both sides, but left to its own factual determinations." *State* v. *Zdanis,* 182 Conn. 388, 395, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981); *State* v. *Forrest,* supra, 148.

The three judge panel found that the defendant's actions on July 11, 1987, were rational and were the

result of a desire for revenge rather than an uncontrollable response to the circumstances. The panel also found that there was no reasonable explanation for the defendant's actions from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be. On the basis of our review of the record, we conclude that these findings are reasonably supported by the evidence.

Although both Zeman and Phillips testified that the defendant was under the influence of extreme emotional disturbance at the time of the shootings, the panel was not obligated to accept their conclusions. *State* v. *Evans,* supra, 238. There was significant evidence from which the panel could reasonably have concluded that the defendant was not suffering from an extreme emotional disturbance on the night of July 11, 1987. For instance, Andrew Patterson testified that the defendant was in a lucid state and knew what he was doing at the time of the shootings.[32] Gregory Raynes, who was at the gathering on Kingfisher Lane and followed the defendant to his home, testified that the defendant was very angry but not out of control. Bazzano testified that the defendant calmed down after they returned to his house and began loading the weapons. That testimony is corroborated by the defendant's coordination of the planning and preparation for the return to Kingfisher Lane. In addition, the firing of the warning shot and the fact that he did not attempt to harm Mrs. Seymour or her daughter also provide evidence that the defendant was not out of control when he arrived at the Seymour home.

Moreover, testimony concerning a prior incident involving the defendant demonstrated that he could control his emotions under similar circumstances. There

---

[32] On cross-examination, Patterson admitted to having told the state police that the defendant was "out of control" and had "snapped" that night.

was evidence that, approximately one month before the shootings, Bazzano and Bryan Patterson had asked the defendant for his assistance when they were being "hassled" by two men at a local convenience store. The defendant and Andrew Patterson arrived shortly thereafter, both armed with guns. The defendant left his gun in the car, however, and went unarmed to talk with the two men. When a police officer drove up, the defendant told him that things were now "under control" and the defendant was complimented by the officer for settling the situation.

There is also significant support for the panel's finding that there was no reasonable explanation for any emotional disturbance suffered by the defendant at the time of the shootings. We recently held in *State* v. *Ortiz*, 217 Conn. 648, 656–58, 588 A.2d 127 (1991), that the determination of the reasonableness of the explanation or excuse for the emotional disturbance must be measured from the viewpoint of a reasonable person in the defendant's situation under the circumstances as the defendant believed them to be. Given the nature of the original altercation and our holding in *State* v. *Ortiz*, supra, the evidence provides sufficient support for the panel's conclusion that there was no reasonable explanation for the defendant to have suffered an extreme emotional disturbance under the circumstances as he believed them to be.[33] We are therefore unpersuaded by the defendant's challenges to the various factual findings of the three judge panel.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[33] As previously noted, the three judge panel could reasonably have concluded that the defendant did not actually believe that the victims were terrorists.