STATE OF CONNECTICUT *v.* RONALD ZDANIS

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and ASPELL, Js.

Argued October 9—decision released December 2, 1980

*Maxwell Heiman,* special public defender, with whom, on the brief, was *William J. Tracy, Jr.,* for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Robert M. Meyers,* assistant state's attorney, for the appellee (state).

BOGDANSKI, J. The defendant was charged with the crime of murder and found guilty after a trial to a three-judge panel. On this appeal the defendant claims that the court erred (1) in concluding that he failed to establish his defense of extreme emotional disturbance; (2) in concluding that he acted with the intent to cause death; and (3) in the instruction to the grand jury that "every person is presumed to intend the natural and necessary consequences of his acts."

Some background review is in order: On December 19, 1974, the grand jurors for Hartford County returned a true bill of indictment charging the defendant with the crime of murder in violation of Public Acts 1973, No. 73-137, § 2, later codified

as General Statutes § 53a-54a. The defendant elected to be tried by a jury of twelve. On May 16, 1975, the jury returned a guilty verdict from which the defendant appealed. This court ordered a remand for a new trial. *State* v. *Zdanis,* 173 Conn. 189, 377 A.2d 275 (1977). Thereafter, the defendant withdrew his jury election and chose to be tried by a three-judge panel. He thereafter filed a notice of intent to rely upon the defense of mental illness.

The defendant first claims that the evidence establishes that he acted under the influence of extreme emotional disturbance and that the court erred in concluding otherwise.

Section 53a-54a of the General Statutes provides that: ". . . it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." As with other affirmative defenses, the defendant has the burden of proof by a fair preponderance of the evidence. General Statutes § 53a-12(b); *State* v. *Elliott,* 177 Conn. 1, 411 A.2d 3 (1979).

In determining whether the defendant has established the affirmative defense of an extreme emotional disturbance by a fair preponderance of the evidence as a mitigation of murder to manslaughter, the trier of fact must find that: (a) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is,

not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions. Consideration is given to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational thinking for that individual no longer prevailed at the time of the act. *State* v. *Elliot,* supra, 9–10.

The defendant does not contest the fact that the court had before it sufficient evidence to find that he caused the death of Pamela O'Neill on the night of October 21, 1974. Rather, the thrust of his argument is that the court should have accepted his affirmative defense that his act should have been reduced to manslaughter in the first degree because of extreme emotional disturbance.

Although this case presents an unusual procedural posture where a three-judge panel serves as the finder of facts (instead of a jury) and where the burden is on the defendant to prove his affirmative defense, the normal rules for appellate review of factual determinations apply and the evidence must be given a construction most favorable to sustaining the court's verdict. *State* v. *Chetcuti,* 173 Conn. 165, 172, 377 A.2d 263 (1977). Moreover, the question is whether upon the facts established and the inferences drawn therefrom the fact-finder could have reasonably concluded that the cumulative effect of the evidence failed to establish that the defendant acted under the influence of an extreme emotional disturbance for which there was a reasonable explanation or excuse. In sum, except where

an abuse of discretion is clearly shown, the conclusion of a trial court should be affirmed so long as it is a reasonable one on the basis of the evidence adduced and the inferences drawn therefrom.

The evidence before the court included the following: Pamela O'Neill, 8 years of age, was the child of the marriage of Barbara Meny and Lawrence O'Neill. After that marriage was terminated by divorce, Barbara Meny O'Neill married the defendant and the couple resided together with Pamela in an apartment at 1465 Willard Avenue, Newington. The defendant had also been previously married. After his divorce from that prior marriage, the defendant lived for a time with the family of his niece, Laurie. He developed a close affection for his niece. Laurie subsequently developed leukemia. On October 18, 1974, the defendant and his wife Barbara journeyed to Philadelphia where his niece lay dying. The defendant was quite upset by his niece's condition. On October 20, 1974, the defendant and Barbara returned to Connecticut.

There was testimony that Mrs. O'Neill saw the defendant on the afternoon of October 21, 1974, at Advo-Systems in Windsor where she worked; that the defendant was in the cleaning business and was going to clean the Advo building that night. At about 4:45 p.m. she brought the defendant to her boss's office to discuss the cleaning job. Thereafter, the defendant walked his wife to her car and told her he would be home about 9:30 that evening. Mrs. O'Neill then picked up her daughter at the home of a friend and proceeded to her parents' home in West Hartford. They later returned to the apartment in Newington and, at about 8:30 p.m., she put Pamela to bed and awaited the defendant's return.

After a while, she heard the door of the apartment open. She got up and approached the hallway where she saw the defendant. She saw that he was holding a gun and she said, "[w]hat are you doing with the gun? I thought you had sold it." She then saw the defendant's finger on the trigger. The defendant said, "[d]on't worry" and made a move towards her. When the defendant approached her with the gun, Mrs. O'Neill ran out of the apartment building. Running outside, she looked back and saw the defendant behind her with the gun raised to his shoulder pointing it at her. She then heard an explosion and felt something pierce her back. She crawled to an adjacent apartment and told the occupants "[h]e killed me . . . go back and get my baby. She is asleep in the bedroom."

The defendant testified that he watched the first half of a Monday night football game in a local bar and that when he got home, his wife gave him a hard time about being so late; that he turned to one side and ignored her complaints. When he turned to her again, he saw his wife naked with a shotgun in her hands. He approached her and asked her what she was doing. She answered that she was tired of his staying out late at night and never being at home, and that as a result of all this, she was going to shoot herself. The defendant then reached for the gun. His wife pulled backwards towards Pamela's room. The defendant lunged to grab the gun and, during the struggle that ensued, the gun went up in the air and fired twice, both of which shots hit Pamela.

The defendant further testified that he finally wrested the shotgun from his wife and started to run after her. He did not remember what happened

after that. He did not contest the fact that he shot his wife outside the apartment building and that he also shot himself.

The defendant's rendition of the factual sequence of events was contradicted by the testimony of two witnesses, a neighbor and a police officer who arrived on the scene soon after the shooting of Mrs. O'Neill. The neighbor testified that he heard two shots being fired in the Zdanis' apartment after Mrs. O'Neill had been wounded. The police officer testified that he heard three shots being fired in the apartment after Mrs. O'Neill had been shot, i.e., the two which killed Pamela and the one fired, presumably, in an unsuccessful suicide attempt.

If the defendant's testimony were to be credited, it would suggest that it was Mrs. O'Neill who was emotionally upset, not he, and that the gun had twice gone off accidentally. Since the burden of proving that he acted only because of his extreme emotional disturbance was on the defendant, the claim of an accidental shooting as well as the claim of action under the influence of extreme emotional disturbance cannot be reconciled. Either the defendant was upset about the impending death of his niece, his marriage problem and the possible suicide by his wife, or he was not. If the shooting of Pamela took place accidentally, the extreme emotional disturbance of the defendant would seem irrelevant.

As to the defense of extreme emotional disturbance, the expert psychiatric testimony was of utmost importance. The state called Dr. Robert Doherty, a psychiatrist, who testified that after an examination of the defendant, it was his professional opinion that the defendant was not under the influence of extreme emotional disturbance. Dr.

Walter Borden, the defendant's witness, testified that the defendant was not psychotic but was in a borderline state, having difficulty with impulse control and reaction to anxiety or frustration. Cross-examination, however, revealed that much of Borden's determination as to extreme emotional disturbance was predicated on what the defendant had related to him as to the factual sequence of events; that in addition to the undisputed fact that the defendant did have a close relative who was about to die and that he had ingested an undetermined amount of alcohol and valium that day, Borden also placed great reliance on what the defendant had told him about his impulsive response to his wife's alleged suicide attempt.

In sum, the defendant's psychiatric testimony could reasonably be rejected by the court as being based on the psychiatrist's assessment of facts which the trial testimony could reasonably have shown to have been erroneous. In the final analysis, however, the ultimate determination of the presence or absence of extreme emotional disturbance was one of fact for the trier, aided by the expert testimony of both sides, but left to its own factual determinations. See *State* v. *Elliot,* supra. On the basis of the evidence before it, we conclude that the court did not err in refusing to find that the defendant had satisfied his burden on this issue.

The defendant next claims that the court erred in finding that the state established that the defendant acted with intent to cause death. Section 53a-54a(a) of the General Statutes requires that the state prove beyond a reasonable doubt that the defendant acted with the specific intent to cause death. *State* v. *Holley,* 174 Conn. 22, 25, 381 A.2d

539 (1977). Intent is a mental process which ordinarily can be proven only by circumstantial evidence. An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. See *State* v. *Holley,* supra.

The pre-1979 law in Connecticut was that a defendant was presumed to intend the ordinary consequences of his voluntary acts. The constitutional infirmities of this rule were exposed in *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), and *State* v. *Harrison,* 178 Conn. 689, 425 A.2d 111 (1979). Those cases held that a jury instruction that is worded in terms of a "presumption" and not an "inference" without a clear instruction on the legal effect of the presumption is unconstitutional. The instruction invalidated in *Sandstrom* read as follows (p. 517): "The law presumes that a person intends the ordinary consequences of his voluntary acts." *Sandstrom* demonstrates that the impact upon the minds of a jury of such an instruction may be either to establish the defendant's intent as a conclusion, or to shift the burden of proof on the element of intent to the defendant.

The defendant contends that because there was insufficient circumstantial evidence of intent, the court must have applied the constitutionally impermissible presumption to find the necessary intent. The claim lacks merit. The verdict rendered by the three-judge panel was a general one. The panel, of course, would not receive any instructions on the law. The defendant has not pointed to anything

in the transcript to show that the court applied the impermissible presumption. Moreover, a review of the United States Supreme Court's rationale in *Sandstrom* indicates that the emphasis throughout Justice Brennan's opinion was on the coercive impact of the charge on the jury. There was no charge here and no jury.

A review of the circumstantial evidence supports the finding of intent. The finding of intent is a reasonable inference from the testimony of Mrs. O'Neill, and from the testimony of the shot sequence by the neighbor and police officer, i.e., two shots close in time coming from the victim's bedroom after the defendant had already wounded his wife.

We conclude that the court did not err in finding the requisite intent.

Lastly, the case of *State* v. *Stepney,* 181 Conn. 268, 435 A.2d 701 (1980), recently decided by this court, is dispositive of the claim that the court erred in instructing the grand jury.

There is no error.

In this opinion the other judges concurred.