STATE OF CONNECTICUT *v.* MICHAEL RICKETTS
(13178)

HEIMAN, SPEAR and HENNESSY, Js.

750

Argued February 7—decision released May 9, 1995

*Richard Emanuel,* assistant public defender, for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Maureen M. Keegan,* assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals[1] from the judgment of conviction, rendered after a trial to a three judge court, of murder in violation of General Statutes § 53a-54a.[2] On appeal, the defendant asserts that the judgment is fatally flawed because (1) the trial court improperly found that he failed to establish the exis-

---

[1] This appeal was taken originally to the Supreme Court. Pursuant to Practice Book § 4023, the Supreme Court transferred the appeal to this court.

[2] General Statutes § 53a-54a provides in pertinent part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

tence of the affirmative defense of extreme emotional disturbance and (2) his right to a fair trial was violated when the prosecutor improperly commented on his invocation of his right to counsel. We affirm the judgment of the trial court.

The three judge court could reasonably have found the following facts. The defendant separated from his wife and began living with the victim, Martha Johnson, at her home on Irion Street in Waterbury. During the three years that they lived together, the defendant fathered the youngest of the victim's three children. In early 1991, the defendant's relationship with the victim began to deteriorate as a result of the defendant's drug use, and the defendant moved into an apartment across the street.

In early July, 1991, Brayard Gordon met the victim when he saw her walking with two other women in Waterbury. The victim gave Gordon her sister's telephone number and invited him to call her there. Gordon and the victim met twice at the victim's sister's home and began to develop a friendship.

On July 23, 1991, Gordon visited the victim at her apartment at Irion Street in Waterbury. As Gordon parked his car on the street in front of the victim's home, the defendant approached him and asked if he was looking for the victim. When Gordon replied that he was, the defendant called out to the victim to let her know that she had a visitor. When asked who he was, the defendant informed Gordon that he was the father of the victim's child. The defendant then laughed and said, "I know how it is . . . we are all men, hey, I used to be with her." The defendant attempted to shake Gordon's hand, but Gordon refused.

On the evening of July 25, 1991, Gordon returned to Irion Street to visit the victim. The victim, who had been napping, answered the door dressed in a robe. She

invited Gordon into her living room while she went into the bathroom to change. Soon after she entered the bathroom, Gordon heard someone banging on the backdoor of the victim's apartment. The victim yelled that she was changing and that she would answer the door as soon as she could. The victim dressed and went to the back door where she saw the defendant demanding to be let in.

The defendant burst through the door and grabbed the victim. He pushed her into the kitchen and held her with her back against the kitchen cupboards while he reached for a knife. The defendant screamed, "Hey bitch—why you doing this to me—I'm going to kill you . . . why you messing around with me—why you doing this?" The victim struggled to free herself from the defendant's grasp and begged him to let her go. The defendant dragged the victim out onto the porch and stabbed her several times. One knife thrust struck deeply into the victim's chest and another into her left cheek.

Gordon picked up a folding chair and rushed at the defendant, striking the defendant on the head and shoulders. The defendant released his grasp on the victim and began to attack Gordon, stabbing him four times.[3] Gordon was then able to reach for a broomstick and strike at the defendant. The defendant backed off and ran from the apartment, disposing of the knife as he went. Gordon threw the folding chair after him before running for help.

---

[3] The defendant was charged in a separate information with assault in the first degree in violation of General Statutes § 53a-59 (a) (3) for the stabbing of Gordon. The defendant elected to have this charge heard separately by a jury after the hearing before the three judge panel on the charge of murder. After the three judge panel returned its verdict of guilty on the charge of murder, the defendant pleaded nolo contendere to the charge of assault in the first degree.

Waterbury police arrived at the victim's apartment shortly thereafter. The victim was bleeding heavily; her pulse was weak and she was unable to talk. She died as a result of stab wounds to her face and chest.

I

The defendant first asserts that the three judge court improperly found that he failed to prove by a fair preponderance of the evidence that he had acted under the influence of an extreme emotional disturbance.[4] We are unpersuaded.

The following facts are necessary for the resolution of this issue. In his defense, the defendant offered the testimony of his examining psychiatrist, Ezra Griffith. Griffith testified that the defendant was dependent on the victim and became outraged when he found out that she was seeing another man. He testified that when the victim refused to answer the door until she changed her clothing, the defendant was convinced that the victim and Gordon had engaged in sexual relations. Griffin, therefore, concluded that on the night of the homicide, the defendant was exposed to an overwhelming state that resulted in a loss of self-control and in which his ability to reason was overborne.

Griffith further testified that the majority of the information that he used in his evaluation came from seven and one-half hours of interviews with the defendant.[5]

[4] The defendant does not contest the fact that the three judge tribunal had before it sufficient evidence to find that the defendant caused the death of Johnson on July 25, 1991. The defendant's claim is limited instead to whether the court properly found that he failed to meet his burden of proof on the affirmative defense of extreme emotional disturbance, which would have reduced the offense to manslaughter in the first degree. See General Statutes § 53a-54a (a).

[5] Other information relied on by Griffith included an interview with the defendant's parents, a telephone call to the defendant's employer, and review of the police report, the autopsy report, the competency evaluation report, the warrant application and the transcript from the hearing in probable cause.

Some of the information relayed to Griffith by the defendant was inconsistent with testimony produced at trial from other witnesses, and some of the testimony revealed facts that were not known by Griffith.[6]

Section 53a-54a provides that "it shall be an affirmative defense [to a charge of murder] that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse . . . ." "In determining whether the defendant has established [this defense] . . . the trier of fact must find that: (a) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by

---

[6] For example, Willie Robinson, a witness called on behalf of the state, testified that after the murder, he spoke to the defendant outside the apartment and the defendant asked him to call an ambulance and also asked Robinson whether "they were going to be alright."

Griffith stated that he did not recall the defendant telling him that he had asked Robinson to call an ambulance or inquiring of Robinson whether they would be alright. The cross-examination then proceeded in part as follows:

"Q. The fact that after Mr. Ricketts stabbed Martha Johnson and stabbed Mr. Gordon, is it important to your diagnosis regarding this dissociated state as to whether or not he told someone, minutes after the stabbing—asked him if he called the ambulance for the two people?

"A. It would be important for me, considering the diagnosis, whatever he said, as well as whether he had conversations with people and so on. That is absolutely correct.

"Q. And, it wouldn't be—Wouldn't it be important to your diagnosis if he said or if he asked someone shortly after the stabbing: are they—that is more than one person, are they going to be alright?

"A. Yes, it will be important.

"Q. Sure, that will be an indication that he knew he stabbed at least two people, not just Mr. Gordon."

extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions." *State* v. *Zdanis*, 182 Conn. 388, 390–91, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 207 (1981); see also *State* v. *Patterson*, 229 Conn. 328, 341, 641 A.2d 123 (1994); *State* v. *Blades*, 225 Conn. 609, 628–29, 626 A.2d 273 (1993). "As with other affirmative defenses, the defendant has the burden of [proving an extreme emotional disturbance] by a fair preponderance of the evidence." *State* v. *Zdanis*, supra, 390; see also *State* v. *Fair*, 197 Conn. 106, 110, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1986).

"[T]he ultimate determination of the presence or absence of extreme emotional disturbance [is] one of fact for the trier, aided by the expert testimony of both sides, but left to its own factual determinations." (Internal quotation marks omitted.) *State* v. *Steiger*, 218 Conn. 349, 383, 590 A.2d 408 (1991); see also *State* v. *Blades*, supra, 225 Conn. 628. The trier may accept or reject the evidence presented by the defendant and may choose to believe or disbelieve expert testimony, even when uncontroverted. *State* v. *Blades*, supra, 629; *State* v. *Raguseo*, 225 Conn. 114, 122–23, 622 A.2d 519 (1993).

Appellate review of such factual determinations is limited, therefore, to whether, viewing the evidence in the light most favorable to sustaining the verdict, the trial court abused its discretion. *State* v. *Patterson*, supra, 229 Conn. 339; *State* v. *Blades*, supra, 225 Conn. 628. Just as we do not sit as a seventh juror, neither do we sit as a fourth judge who may cast a vote against a finding by the three judge court that the defendant has failed to sustain his burden on the issue of extreme emotional disturbance based upon a vague feeling that the result could be different. See *State* v. *Stepney*, 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465

U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984); *State* v. *Pearl*, 28 Conn. App. 521, 526, 613 A.2d 304 (1992). "[E]xcept where an abuse of discretion is clearly shown, the conclusion of a trial court should be affirmed so long as it is a reasonable one on the basis of the evidence adduced and the inferences drawn therefrom." *State* v. *Zdanis*, supra, 182 Conn. 392.

We cannot say that the three judge panel abused its discretion in determining that the defendant failed to sustain his burden of proof. Our review of the transcript reveals a plethora of inconsistencies between the statements made to Griffith by the defendant and the testimony of other witnesses, as well as a number of omissions in the defendant's story to Griffith. Taken cumulatively, these inconsistencies and omissions afforded the trier of fact the basis on which to determine that Griffith's opinion that the defendant suffered from an extreme emotional disturbance was not persuasive by a fair preponderance of the evidence.

## II

The defendant next asserts that his right to a fair trial was violated by the conduct of the state's attorney in commenting on the defendant's invocation of his right to counsel. The defendant claims that the conduct of the prosecutor (1) constitutes a violation of his rights enumerated in *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), and (2) rises to the level of prosecutorial misconduct. We disagree with both assertions.

Certain additional facts are necessary to a proper resolution of this claim. In the course of his defense, the defendant called his mother, Adrienne Ricketts, as a witness in his behalf. She testified that she and her husband located the defendant after the incident and brought him to the Waterbury police station. The defendant's mother further stated that she and her hus-

band had accompanied the defendant into the police station and had been with him in the detective bureau. She testified that she left the police station about 9 p.m., leaving the defendant there, and that later that evening, when she called the police station, she learned for the first time that the defendant was being charged with murder. She also testified in response to a question by defense counsel that the following morning she went to the courthouse and spoke to someone from the office of the public defender.

On cross-examination, the state's attorney asked the defendant's mother if she knew that the defendant had requested a lawyer or that a lawyer came to see the defendant at the station house. She replied that she did not. After a series of similar questions were asked and answered, counsel for the defendant objected and that objection was sustained.[7]

---

[7] On cross-examination the following occurred:

"[State's Attorney John Connolly]: Were you with Michael when the policeman talked to him?

"[Adrienne Ricketts]: I don't think so.

"Q. Were you with Michael when the—when he asked Detective Demers if he could have a lawyer?

"A. I never heard any—Michael say anything, no.

"Q. You never heard him say anything?

"A. No.

"Q. So, you didn't hear him say that?

"A. No, no, I don't think he was capable of saying anything like that, I never heard that.

"Q. Do you know later that night a lawyer did come for Michael?

"A. I didn't know, I didn't know that.

"Q. You didn't know that?

"A. No.

"Q. You said you talked to the Public Defender's Office the next day, didn't you?

"A. Yes.

"Q. Did you talk to Mr. McWhirter the next day?

"A. Yes.

"Q. Did he tell you he was at the police station that evening?

"A. I don't recall.

"Q. You don't recall that?

## A

The defendant's first assertion regarding the conduct of the prosecutor is that it violated his rights under *Doyle* v. *Ohio*, supra, 426 U.S. 610.

In *Doyle* v. *Ohio*, supra, 426 U.S. 619, the United States Supreme Court held that "evidence of a defend-

"A. No.

"Q. He didn't tell you that the State's Attorney called him at his home because Michael Ricketts wanted a lawyer and Mr. McWhirter came down that evening?

"[Defense Counsel]: Your Honor, I am going to object at this point.

\* \* \*

"It appears as though Mr. Connolly is using Mr. Ricketts' invocation of his constitutional right to an attorney in order to defeat any claim of his emotional condition that may be related to an [extreme emotional disturbance]. And, under *State* v. *Hull*, [210 Conn. 481, 556 A.2d 154 (1989)] that is inappropriate. He is—It's not just coming in through a police officer, who is indicating to Mr. Connolly that he advised him of his constitutional rights and this is what happened and we terminated the conversation. But, he is doing exactly what the Supreme Court said is not allowed in *State* v. *Hull* [supra, 481]. He is using it in an argument to somehow defeat Mr. Ricketts—the testimony given with regard to Mr. Ricketts' condition.

"[The Court]: If I could—

"[Defense Counsel]: That is not appropriate.

"[The Court]: If I could just cut you short, I mean, there are different standards for a court and jury. And it is thought, at least, that at the end of the day we can sort out the admissible from the inadmissible. Although clearly inadmissible material should not come before us.

"If I can ask you, Attorney Connolly—

"[State's Attorney]: Surely.

"[The Court]: Apparently you are getting into a whole line of alleged statements by the defendant, that this witness says she never even heard at all. So I wonder if there is any—are you claiming—Let me just ask you, if I may, sir, are you claiming that their witness, indeed, did hear the defendant make these various statements and requests?

"[State's Attorney]: No. But—and, the questions I asked, Your Honor, is—she's testified, because of the condition Mr. Ricketts was in after the incident—she just very dramatically described his physical condition, he was shaking, jumping up and down. What I am trying to show is that because of her actions towards Mr. Ricketts, maybe, indeed, Mr. Ricketts that evening wasn't acting all that bad. She said she was concerned. She came to court the next day. The question is: she talked to—

"[The Court]: If I can just again cut you short. I don't think that there is any problem based on what I have heard about you asking this witness

ant's postarrest and post-*Miranda*[8] silence is constitutionally impermissible under the due process clause of the fourteenth amendment." *State* v. *Daugaard,* 231 Conn. 195, 210–11, 647 A.2d 342 (1994). This prohibition extends to include the invocation by a criminal defendant of his right to remain silent until he can consult with an attorney. Id.; see also *State* v. *Hull,* 210 Conn. 481, 489, 556 A.2d 154 (1989), citing *Wainwright* v. *Greenfield,* 474 U.S. 284, 295 n.13, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986). Such evidence may not be used to impeach a defendant who testifies on his own behalf;

---

what she observed, what she saw, what she heard Mr. Ricketts say, what she said to Mr. Ricketts. But, the problem that I had with the line of questioning you were getting into was that you were asking her about a whole lot of things, at least, she says she never observed at all. And, you are not claiming that she did observe them.

"[State's Attorney]: No, no.

"[The Court]: Is there any point in pursuing this?

"[State's Attorney]: Well, I think the objection was made when I asked her whether or not Miss Dalton elicited on direct examination that the day after the incident she went—Mrs. Ricketts went to the Public Defender's Office. I guess the relevancy of that is that she was still concerned for Mr. Ricketts, his well-being, and talked to his lawyers. Now, what I am asking is whether or not what happened that—I mean, whether or not she was informed that Mr. McWhirter had been at the police station that evening with Mr. Ricketts.

"[The Court]: Is that relevant to any issue in the case?

"[State's Attorney]: Well, she brought it up about him being at the Public Defender's Office. Why can't I ask?

"[The Court]: Well, I am not sure that I saw the relevance of that. Let me just ask you once again, is this line of questioning relevant to any issue in this case?

"[State's Attorney]: Yes, Mr. Ricketts' state of mind at the time of the murder of Martha Johnson. And, to show the state of mind, we can show his conduct before and after the incident.

"[The Court]: The court will sustain the objection at this point, not necessarily on the ground stated, but I think that the relevancy is pretty limited at this point. And, you may go on and ask this witness of anything she saw, you know, pertaining to Mr. Ricketts, of anything that she heard him say, of anything that she said to Mr. Ricketts, that is fair game. But, I think you have gone beyond the line here. So, objection is sustained."

[8] *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

*State* v. *Joly*, 219 Conn. 234, 256, 593 A.2d 96 (1991); to imply guilt or to indicate a consciousness of guilt; *State* v. *Cooper*, 227 Conn. 417, 437, 630 A.2d 1043 (1993); or to rebut a defendant's claim of intoxication or extreme emotional disturbance. *State* v. *Hull*, supra, 489–90.

Several questions were asked of the defendant's mother by the state's attorney regarding her knowledge of the defendant's request for an attorney. We first address the final question, to which the defendant's objection was sustained, and then turn to the preceding questions to which no objections were interposed.

1

The state's last question to the defendant's mother regarding her knowledge of the events that occurred while the defendant was at the police station was objected to by defense counsel on the ground that it violated the defendant's rights under *State* v. *Hull*, supra, 210 Conn. 481. The three judge panel sustained the defendant's objection and the witness was not permitted to answer the question.

We conclude that the mere asking of the question was not a violation of *Doyle* v. *Ohio*, supra, 426 U.S. 619. See *Greer* v. *Miller*, 483 U.S. 756, 764–65, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987). In sustaining the defendant's objection, the trial court prevented itself from hearing any evidence that *Doyle* forbids. Thus, the defendant's invocation of his right to silence until he could consult an attorney was not placed in evidence and no violation of *Doyle* v. *Ohio*, supra, 619, occurred.

2

We turn next to an examination of the questions that the defendant now claims were violative of *Doyle* v. *Ohio*, supra, 426 U.S. 619, but to which no objection

was raised before the trial court. The defendant requests review of this unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).

We will not reiterate the now familiar four prongs of *State* v. *Golding*, supra, 213 Conn. 239–40, that must be satisfied in order for the defendant to prevail on an unpreserved claim such as that presented here. We do, however, point out that the inability to meet any one prong requires a determination that the defendant's claim must fail. Id. We conclude that the defendant has failed to establish the third prong of *Golding*, that "the alleged constitutional violation clearly exists and clearly deprived [him] of a fair trial." Id.

In response to the state's questions, the witness testified that she did not hear the defendant request an attorney, nor did she recall being told whether an attorney had come to the police station at the request of the defendant. Thus, no evidence was elicited to establish that the defendant ever made a request for counsel after the administration of the *Miranda* warning. It necessarily follows that since no improper evidence was adduced, no *Doyle* violation occurred and the defendant cannot establish a violation of a his fundamental right to a fair trial. See *State* v. *Golding*, supra, 213 Conn. 239.

The defendant has failed to satisfy the third *Golding* prong and his claim must, therefore, fail.

B

The defendant's final argument is that, even if there has been no violation of *Doyle* v. *Ohio*, supra, 426 U.S. 610, the actions of the state's attorney in asking the questions constitutes prosecutorial misconduct. We are again unpersuaded.

The defendant did not object at trial to the actions of the state's attorney on the ground now presented

on appeal. The defendant, therefore, again requests review of this unpreserved claim under *State* v. *Golding*, supra, 213 Conn. 239–40. We conclude that the defendant's claim must fail as he has not established a clear violation of his fundamental right to a fair trial.

"We will not afford *Golding* review to claims of prosecutorial misconduct where the record does not disclose a pattern of misconduct pervasive throughout the trial or conduct that was so blatantly egregious that it infringed on the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Williams*, 231 Conn. 235, 246, 645 A.2d 999 (1994), quoting *State* v. *Young*, 29 Conn. App. 754, 766–67, 618 A.2d 65 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287 (1993).

Our review of the record discloses that the actions of the state's attorney do not constitute a pattern of misconduct that pervaded the defendant's trial and that his rights to a fair trial were not infringed. The defendant's argument rests on an assertion that the state's attorney conveyed to the trier of fact information that the defendant had invoked his right to counsel. In order to reach this conclusion, we would be required to infer that the three judge court, even though the witness on each occasion said that she did not know whether the defendant had requested or had talked with a lawyer, drew an inference that he had in fact made such a request. Such a claim is not factually supported by the record. This is especially true in light of the fact that the trial was before a three judge court and not before a jury, which decreased the likelihood that the trier of fact would draw an improper inference from the evidence or the lack of evidence. See *State* v. *Robles*, 33 Conn. App. 60, 64, 632 A.2d 1377 (1993).

We note also that the sole question to which an objection was interposed on the basis of *Doyle* v. *Ohio*, supra, 426 U.S. 610, was sustained by the trial court. In addi-

tion, "[t]rial counsel for the defendant, who had been assiduous in [her] protection of the rights of the defendant throughout the trial, was so unimpressed by the alleged prosecutorial misconduct that [she] neither objected to the remarks nor asked for a curative instruction." *State* v. *Lucci*, 25 Conn. App. 334, 348, 595 A.2d 361, cert. denied, 220 Conn. 913, 597 A.2d 336 (1991). Further, the answers given by the witness disclaiming any knowledge of any request by the defendant for counsel negates the drawing of any inference from the question.

The conduct of the state's attorney does not reveal any pattern of misconduct repeated throughout the trial nor any conduct that was blatantly egregious; *State* v. *Williams*, supra, 231 Conn. 246; and we, therefore, decline to afford review to this claim.

The defendant does not fare any better under his claim for review under the plain error doctrine. Practice Book § 4185. "[P]lain error review is reserved for truly extraordinary situations where the existence of error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Boyd*, 36 Conn. App. 516, 522, 651 A.2d 1313, cert. denied, 232 Conn. 912, 654 A.2d 356 (1995); see also *State* v. *Boles*, 223 Conn. 535, 551, 613 A.2d 770 (1992).

Having concluded that the claim of prosecutorial misconduct of which the defendant now belatedly complains did not implicate his constitutional rights so as to warrant review under *State* v. *Golding*, supra, 213 Conn. 240, we conclude that the questions by the prosecutor and the answers by the witness did not result in manifest injustice, and, therefore, does not permit plain error review. See *State* v. *Morales*, 33 Conn. 184,

197, 634 A.2d 1193 (1993), cert. granted on other grounds, 228 Conn. 928, 640 A.2d 116 (1994).

The judgment is affirmed.

In this opinion the other judges concurred.