******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* PATRICK
JAMES CANNON
(AC 38000)

Beach, Keller and Lavery, Js.

*Argued January 6—officially released May 10, 2016*

(Appeal from Superior Court, judicial district of
Waterbury, Cremins, Crawford and Agati, Js.)

*Deborah G. Stevenson*, assigned counsel, for the
appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom,
on the brief, were *Maureen Platt*, state's attorney, and
*Cynthia S. Serafini*, senior assistant state's attorney,
for the appellee (state).

*Opinion*

LAVERY, J. The defendant appeals from the judgment of conviction, rendered after a trial before a three judge court (panel), of murder in violation of General Statutes § 53a-54a (a) and tampering with evidence in violation of General Statutes § 53a-155 (a). On appeal, the defendant claims that the panel improperly concluded that he had failed to prove his affirmative defense of extreme emotional disturbance by a fair preponderance of the evidence. Because the factual findings and verdict of the panel are supported by the evidence, we affirm the judgment of conviction.

On the basis of the evidence presented at trial, the panel reasonably could have found the following facts. The defendant met the victim, Cynthia Cannon, in 2003. At that time, the defendant was living in an apartment. A few months after they met, the victim and her two year old daughter from a prior marriage moved into the defendant's apartment. In 2004, the defendant and the victim married. Following their marriage, the family moved out of the apartment and into a home that the defendant purchased, secured by a mortgage.

In 2005, the couple began and ended marriage counseling. Later that year, the defendant assaulted the victim while she was pregnant with their son. In October, 2005, shortly after the assault, the victim gave birth to the couple's son. Following the birth of their son, the couple continued to argue.

In the spring of 2006, the victim had an affair. The defendant learned about the affair by reading the victim's emails. Three years later, the victim had a second affair, this time with the father of her daughter. Again, the defendant discovered the affair by reading the victim's emails.

In June, 2009, the defendant lost his job. As a result, the defendant wanted to sell the couple's house and move into a more affordable apartment. The victim resisted this and the couple stayed in the home. However, the next month the defendant stopped making mortgage payments and the couple's disagreement on whether to sell the home became the cause of even more arguments.

Instead of paying the mortgage, the defendant used the money from his savings account, a loan, and unemployment income to start three businesses. Initially, the defendant operated all of the businesses from the home. Almost immediately, the businesses began to earn the defendant income. As a result of his improved financial situation, the defendant moved his business out of his home, renting commercial property in December, 2009. Nevertheless, the defendant did not resume making mortgage payments for his and the victim's home and did nothing to prevent foreclosure proceedings, which commenced in the fall of 2009.

Toward the end of 2009, the victim told the defendant that she wanted a divorce. The defendant did not want a divorce. He believed that they could work out their problems. The victim did not want to work things out and, in early 2010, began sleeping on the couch at night. The victim also took a second job, found a new place to live, and began to pack her belongings into boxes.

After this, the arguments, which had become frequent between the couple, continued. During one of these arguments, in March 2010, the victim told the defendant that she was going to take their son and that the defendant would never see his son again. In a later discussion, however, the couple agreed to allow the court to determine custody of their son, following their divorce. During an ensuing argument the next month—one month before the defendant murdered the victim and concealed her body—the defendant threatened to kill the victim and put her body in the woods. Scared, the victim told a friend that if she went missing, the defendant did it.

Late in the evening of May 6, 2010, the victim was sitting on the couch texting a friend. The last text message that was sent from the victim's phone was sent at 11:59 p.m.

Seconds later, at approximately 12:00 a.m. on May 7, 2010, the defendant hit the victim in the head at least six times with a hammer, broke the victim's jaw with an object consistent with a fist, and, after the victim had fallen from the couch and lay on the floor, the defendant stabbed the victim twice in the chest with a razor. The victim, alive throughout this ordeal, died as a result of the injuries to her head and the stab wounds to her chest.

The defendant then dragged the victim's body into the kitchen and placed the body in a sleeping bag. He then cleaned the victim's blood off of the carpet and couch. After cleaning the murder scene, the defendant, using a rope and a tarp, dragged the victim's body outside and put it in the back of the victim's car. He then returned to clean the kitchen.

The defendant then drove the victim's body to a nearby town. He removed the victim's pants and underwear and concealed the body at the bottom of an embankment underneath a tarp. While driving back to his house, the defendant threw the murder weapons and the victim's cell phone out of the car window.

After returning home, the defendant cleaned the last of the bloody clothes and put them into trash bags. Later that morning on the way to work, he discarded the trash bags in a dumpster. That evening, he drove the victim's car to a location near where the victim had been on May 6. Attempting to make it look like the victim had been robbed, he abandoned the car there and then walked home. On his way home, he discarded

the victim's wallet, the sleeping bag he had used to cover the victim's body, and the rope he had used to drag the body.

In addition to attempting to cover up the murder by disposing of the evidence, the defendant began to lie about the victim's whereabouts. He told the victim's friends that he did not know where the victim was. In addition, he voluntarily went to the police station and gave a voluntary statement to police officers. In that statement, the defendant denied knowing about the victim's whereabouts, described the victim as someone who would leave home for days at a time, and suggested that the father of the victim's daughter was responsible for her disappearance. During this statement, he referred to the victim in the past tense and, appearing to be nervous, stated that "mistakes happen."

A police investigation ensued. During the course of the investigation, the police found the sleeping bag discarded along the side of a road. The police also searched the crime scene and found the trail of blood left after the defendant dragged the victim's body out of the house. The investigation also revealed that the defendant had used his computer to research carpet cleaning, storage facilities, and dumpster rental. In the defendant's vehicle, the investigation found carpet cleaning supplies, unused nylon rope, several bungee cords, unused trash bags, and a tarp. In addition, the investigation discovered that the defendant had set an alarm for 2:15 a.m.

The defendant was arrested on May 10, 2010. The body, however, was not discovered until May 17, 2010.

On May 10, 2010, the state, in a substitute information, charged the defendant with murder in violation of § 53a-54a (a) and tampering with evidence in violation of § 53a-155 (a).

On May 23, 2013, the defendant withdrew his demand for a jury trial and elected to be tried by the panel. The trial began on September 24, 2013, before the panel, *Cremins*, *Agati* and *Crawford*, *Js*. On October 10, 2013, the state rested and the defendant made an oral motion for judgment of acquittal. The panel denied that motion.

The defendant then put on evidence that sought to establish the affirmative defense of extreme emotional disturbance. To establish this defense, the defendant testified on his own behalf. He admitted that he had killed the victim, but claimed that he had done so under the influence of extreme emotional disturbance caused by the combination of several stressful conditions that had occurred during the months preceding the murder[1] and his ultimate argument with the victim on the night of May 6 and early morning of May 7. According to the defendant, the argument began after he awoke around midnight on May 6 and went downstairs to get something to eat or drink. The defendant testified that once

downstairs, the victim initiated a loud and emotional argument in which the victim questioned the defendant's feelings for her, criticized his inability to provide for his family, and accused him of being a "lousy husband." The defendant further testified that he tried to leave, but could not due to the victim's continued screaming. In response, he testified that he told the victim how much he loved her and that he wanted to remain married, but she informed him that she was going to leave him and that he would never see his son again. These comments, the defendant testified, caused him to lose control, and the next thing the defendant remembered he was kneeling next to the victim's dead body. In addition to his own testimony, the defendant presented the testimony of Doctor Peter Morgan to support his extreme emotional disturbance defense. Morgan testified that he had conducted interviews with the defendant in which he had learned about the defendant's financial and emotional stressors at and around the time of the murder. From those interviews, Morgan developed the opinion that the stressors and the defendant's ultimate argument with the victim caused the defendant to suffer sudden and extreme feelings of distress, fear, and anger. According to Morgan, these feelings diminished the defendant's capacity to control his behavior at the time of the murder.

On October 16, 2013, the defendant rested his extreme emotional disturbance case. The case was submitted to the panel on October 17, 2003, and the panel returned a verdict of guilty as to both counts of the information on October 18, 2013.

In its verdict, the panel found the defendant guilty of murder in violation of § 53a-54a (a) and tampering with evidence in violation of § 53a-155 (a). With respect to the murder charge, the panel stated: "The crime of murder requires two essential elements be proven beyond a reasonable doubt. Those elements are: [f]irst, that the defendant had the intent to cause the death of another person, in this case, [the victim]; and, second, that, acting with that intent, the defendant caused the death of [the victim]. The state bears the burden of proving each of these elements beyond a reasonable doubt. The court finds that from the totality of the credible evidence and the reasonable inferences drawn therefrom that the state has met its burden of proving the elements of the crime of murder beyond a reasonable doubt. We find that the evidence has established beyond a reasonable doubt that the defendant did possess the intent to cause the death of [the victim]. We also find beyond a reasonable doubt that the defendant caused the death of [the victim]."[2]

The panel then stated that it had considered the defendant's affirmative defense of extreme emotional disturbance. It set forth the relevant principles of law concerning the affirmative defense of extreme emo-

tional disturbance, explaining: "In order to prevail on th[e] affirmative defense [of extreme emotional disturbance], the defendant must prove by a preponderance of the evidence that he caused the death of [the victim] under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse measured from the viewpoint of a reasonable person in the defendant's situation under the circumstances as he believed them to be. To determine whether the defendant has met his burden, the defendant must prove by a preponderance of the evidence the following: First, that the emotional disturbance was not a mental disease or defect that rises to the level of insanity as defined by our Penal Code. . . . Second, that the defendant was exposed to an extreme unusual and overwhelming stress that is more than mere annoyance or unhappiness. . . . Third, that the defendant had an extreme emotional reaction to this stress as a result of which there was a loss of self-control and his reason was overcome by intense feeling such as passion, anger, distress, grief, excessive agitation or other similar emotions."

The panel then rejected the defendant's affirmative defense of extreme emotional disturbance. In doing so, the panel made the following pertinent findings: "[1] The court finds that the credible evidence establishe[d] the defendant did not suffer from any disease or defect that rose to the level of insanity as defined by our Penal Code. . . . [2] The court finds by the credible evidence that the defendant's loss of self-control was not caused by extreme or overwhelming stress that was more than mere annoyance or unhappiness. The credible evidence establishe[d] that there were ongoing issues between the defendant and [the victim] related to divorce and custody matters, financial and foreclosure matters and the state of the relationship between the parties. The court heard no credible evidence that made the date of the incident or the period immediately preceding that date any different in intensity from any other period during their relationship. . . . [3] The court finds that the incident of the evening of May 6, 2010 through the morning of May 7, 2010 between the victim . . . and the defendant, when considered from the viewpoint of a reasonable person in the defendant's situation under the circumstances as the defendant believed them to be, did not provide a reasonable explanation for the defendant's act of killing [the victim]. [Additionally] [t]he court . . . finds that the defendant's conduct cannot be reasonably explained. The events of May 6 and 7, 2010, were not significantly different from those surrounding any of the couple's prior interactions as reflected by the credible evidence presented about the couple's relationship. Accordingly, the court finds that the defendant has not sustained his burden to prove the defense of extreme emotional disturbance."

On January 17, 2014, the court sentenced the defen-

dant to a total effective sentence of sixty-five years incarceration. This appeal followed.

On appeal, the defendant claims that the panel improperly found that he had failed to prove his affirmative defense of extreme emotional disturbance by a fair preponderance of the evidence.[3] The state argues that the panel's rejection of the factual basis of the defendant's extreme emotional disturbance claim was a decision that was well within its province to make. We agree with the state.

General Statutes § 53a-54a (a) provides in relevant part: "[I]n any prosecution [for murder], it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ."

"[E]xtreme emotional disturbance is a mitigating circumstance which will reduce the crime of murder to manslaughter. . . . Pursuant to General Statutes § 53a-12 (b), [w]hen a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence. . . .

"A homicide influenced by an extreme emotional disturbance . . . is not one which is necessarily committed in the hot blood stage, but rather one that was brought about by a significant mental trauma that caused the defendant to brood for a long period of time and then react violently, seemingly without provocation. . . . For the defendant to have prevailed on this defense, he would have had to establish, by a preponderance of the evidence, that he had caused the death of the victim under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse measured from the viewpoint of a reasonable person in the defendant's situation under the circumstances as the defendant believed them to be. . . . To sustain his burden of establishing extreme emotional disturbance by a preponderance of the evidence, the defendant must persuade the trier of fact that: (1) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code; (2) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (3) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feeling, such as passion, anger, distress, grief, excessive agitation or other similar emotions. . . . Consideration is given to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational

thinking for that individual no longer prevailed at the time of the act. . . . [T]he term extreme refers to the greatest degree of intensity away from the norm for that individual." (Citations omitted; internal quotation marks omitted.) *State* v. *Ruben T.*, 104 Conn. App. 780, 785–86, 936 A.2d 270 (2007), cert. denied, 285 Conn. 917, 943 A.2d 476 (2008).

"[T]he ultimate determination of the presence or absence of extreme emotional disturbance [is] one of fact for the trier, aided by the expert testimony of both sides, but left to its own factual determinations. . . . The trier may accept or reject the evidence presented by the defendant and may choose to believe or disbelieve expert testimony, even when uncontroverted. . . .

"Appellate review of such factual determinations is limited, therefore, to whether, viewing the evidence in the light most favorable to sustaining the verdict, the trial court abused its discretion. . . . Just as we do not sit as a seventh juror, neither do we sit as a fourth judge who may cast a vote against a finding by the three judge court that the defendant has failed to sustain his burden on the issue of extreme emotional disturbance based upon a vague feeling that the result could be different. . . . [E]xcept where an abuse of discretion is clearly shown, the conclusion of a trial court should be affirmed so long as it is a reasonable one on the basis of the evidence adduced and the inferences drawn therefrom." (Citations omitted; internal quotation marks omitted.) *State* v. *Ricketts*, 37 Conn. App. 749, 755–56, 659 A.2d 188, cert. denied, 234 Conn. 913, 660 A.2d 355, cert. denied, 516 U.S. 977, 116 S. Ct. 481, 113 L. Ed. 2d 409 (1995).

In the present case, the panel concluded that the defendant had not proved his affirmative defense of extreme emotional disturbance by a preponderance of the evidence. The panel supported this conclusion with specific findings regarding each of the factual bases that the defendant had the burden to establish. In particular, the panel found that the defendant's loss of self-control was not caused by an "extreme[ly] unusual and overwhelming" state. Instead, the panel found that the evidence disclosed "ongoing issues" between the defendant and the victim relating to their marriage, pending divorce, and financial issues that dated back to 2005. As a result, the panel found that the events of May 6 and 7, 2010, were "not significantly different" from other arguments between the couple and, accordingly, those circumstances did not provide a reasonable explanation for the defendant's murder of the victim.

This conclusion is amply supported by the record, which discloses that the defendant's relationship with the victim had deteriorated since 2005. The record reveals that the defendant's relationship with the victim suffered from incidents of physical abuse, arguments, a death threat, a failed attempt at counseling, threats

of divorce, child custody discussions, and the victim's two affairs, which the defendant tolerated, dating back to 2005. As such, the record supports the panel's finding that the events of May 6 and 7, 2010, were not "extreme[ly] unusual [or] overwhelming" nor significantly different from those surrounding the couple's prior arguments during their relationship and did not provide a reasonable explanation for the defendant's murder of the victim. See *State* v. *Blades*, 225 Conn. 609, 629–30, 626 A.2d 273 (1993); see also *State* v. *Crespo*, 246 Conn. 665, 681, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999); *State* v. *Ruben T.*, supra, 104 Conn. App. 786–87.

Further, the panel was entitled to reject some or all of the defendant's testimony, and some or all of Morgan's expert testimony, in support of the defendant's extreme emotional disturbance affirmative defense. *State* v. *Gonzalez-Rivera*, 48 Conn. App. 784, 792, 713 A.2d 847, cert. denied, 245 Conn. 923, 717 A.2d 238 (1998).

In particular, the defendant's version of the events immediately preceding the murder was inconsistent with other evidence produced at trial. For example, the defendant testified that the argument was "so loud," but the sleeping children, in upstairs bedrooms, one with her bedroom door open, never stirred. Additionally, the defendant testified that he hit the victim while she was standing up; however, the forensic evidence indicated that the victim was struck while she was sitting down. Furthermore, the defendant's testimony regarding how his precarious financial situation added to his emotional disturbance was called into question by testimony that he was doing fairly well in his new business. Finally, the panel also had evidence before it that the defendant lied to the victim's friends and the police. These inconsistencies afforded the panel a more than adequate basis; see *State* v. *Steiger*, 218 Conn. 349, 381, 590 A.2d 408 (1991) (trier of fact does not need inconsistencies to disbelieve witness's testimony because "the trier of fact can disbelieve any or all of the evidence . . . and can construe that evidence in manner different from parties' assertions"); to reject the defendant's testimony in part or completely. See *State* v. *Ricketts*, supra, 37 Conn. App. 756.

In addition, the panel was equally permitted to reject the testimony of the defendant's expert witness. *State* v. *Gonzalez-Rivera*, supra, 48 Conn. App. 792. Even though the panel could have chosen independently to reject Morgan's expert testimony separately from the defendant's testimony; *State* v. *Steiger*, supra, 218 Conn. 381; the inconsistencies in the defendant's testimony further weakened Morgan's expert assessment of the defendant's state of mind because Morgan's opinion, developed by interviewing the defendant, relied on the assumption that the defendant's version of events was accurate. It is the role of the fact finder to determine

what evidence to believe, whether it be all, part, or none of a witness's testimony, and appellate courts honor the trier's assessment and resolve conflicting evidence in favor of sustaining the verdict. See *State* v. *Allen*, 289 Conn. 550, 559, 958 A.2d 1214 (2008); *State* v. *Lawrence*, 282 Conn. 141, 154–55, 920 A.2d 236 (2007); *State* v. *Owens*, 63 Conn. App. 245, 251, 775 A.2d 325, cert. denied, 256 Conn. 933, 776 A.2d 1151 (2001).

Finally, the record reveals that there was ample evidence that the murder was not the product of extreme emotional disturbance, but was planned and deliberately executed by the defendant. The police investigation revealed that, prior to murdering the victim, the defendant had researched carpet cleaning, storage facilities, and dumpster rentals. Additionally, although the murder occurred at approximately 12:00 a.m. on May 7, 2010, the defendant had set an alarm for 2:15 a.m. From this, the panel could have inferred that the defendant intended to murder the victim at 2:15 a.m., but woke up and executed his plan earlier. Furthermore, it is not irrelevant that the defendant methodically covered up the murder by cleaning the crime scene, disposing of the victim's car and personal effects in such a way as to suggest she was abducted, telling friends and relatives that she was missing, and hiding the body.[4] Such evidence of intent and planning directly refutes a claim of extreme emotional disturbance; see *State* v. *Steiger*, supra, 218 Conn. 381–84; and "the three judge [panel] could reasonably have determined that the defendant had planned his attack on the victim and that he had calmly and deliberately executed that plan." *State* v. *Patterson*, 229 Conn. 328, 341, 641 A.2d 123 (1994). Therefore, we conclude that the panel's rejection of the defendant's extreme emotional disturbance affirmative defense is supported by the evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In particular, the defendant testified that prior to the night of the murder, he suffered from the stress resulting from his job loss, the foreclosure of his home, his deteriorating relationship with his wife, his pending divorce and child custody concerns, and his struggling business and long work hours.

[2] With respect to the tampering charge, the panel stated: "[Tampering with evidence] requires the state to prove that: One, the defendant believed that an official proceeding was pending or about to be instituted; two, that the defendant tampered with physical evidence; and, three, that the defendant altered, destroyed, concealed or removed an item with the purpose of impairing its veracity or availability in such proceedings. The court finds that the state has proven these three elements beyond a reasonable doubt."

[3] In his brief before this court, the defendant styles this claim as two separate claims: (1) that the panel reasonably could not have rejected his extreme emotional disturbance defense; and (2) that the panel improperly denied his motion for judgment of acquittal as to the murder count because he established his extreme emotional disturbance defense. These claims present the same issue, and therefore we address them as one.

[4] A passing motorist found the body on May 17, 2010.